RECEIPT #
AMOUNT $ 250
SUMMONS ISSUED N/A
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE                5-31-05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ATLAS GARDEN SUPPLY, LLC,

               Plaintiff,

vs.                                                Civil Action No. _____

INTRUDER, INC., AMES TRUE TEMPER
COMPANY AND HARRY S. BILLADO

               Defendant.

                      **05  11122 JLT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MAGISTRATE JUDGE Collings

## NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT

To: Civil Clerk's Office, United States District Court for the District of Massachusetts,
United States District Court, District of Massachusetts, U.S. Courthouse, One Courthouse
Way, Boston, Massachusetts 02210

Clerk's Office, Suffolk County Courthouse, 12th Floor, Three Pemberton Square, Boston,
Massachusetts, 02108

**PLEASE TAKE NOTICE** that pursuant to 28 U.S.C. §1441 and 1446 the defendant,

Harry Billado, by and through its attorneys, Devine, Millimet & Branch, Professional

Association, hereby removes this civil action from the Suffolk County Superior Court to the

United States District Court for the District of Massachusetts upon the following grounds:

1.    This is an action by plaintiff Atlas Garden Supply, LLC, a Massachusetts limited

liability company, in which a variety of common law claims, federal claims and state statutory

claims have been asserted against three defendants.

2.    None of the defendants is a citizen of Massachusetts within the meaning of 28

U.S.C. § 1332(a)(1). See Complaint at ¶¶5, 6 and 7.

3.    Although the Complaint does not specify the amount of damages sought, plaintiff seeks to recover actual damages, "multiple damages" and attorneys' fees and, upon information and belief, the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000 within the meaning of 28 U.S.C. §1332(a).

4.    This Court has jurisdiction by virtue of diversity of citizenship and removal is thus proper pursuant to 28 U.S.C. §1441(a).

5.    The Complaint also raises claims which give rise to federal question jurisdiction within the meaning of 28 U.S.C. §1331. See, e.g., Complaint at ¶¶ 62-65 (Lanham Act) and see, generally, allegations in Complaint alleging ownership of improvements to a patented device. Removal is proper pursuant to 28 U.S.C. §1441(a) for this reason, as well.

6.    Removal is timely within the meaning of 28 U.S.C. §1446(b) in that defendants received their copies of the initial pleadings setting forth the causes of action herein during the period May 2 through May 5, 2005.

7.    The plaintiffs commenced this action in the Suffolk County Superior Court. The District of Massachusetts constitutes "the district and division embracing" the court in which this matter is currently pending. See 28 U.S.C. §1441(a). Accordingly, venue is proper in this Court.

8.    Undersigned counsel certified that each of the defendants has consented to the removal of this action.

9.    Copies of the Summons, Complaint and Civil Action Cover Sheet, constituting all process pleadings and orders served upon the defendant within the meaning of 28 U.S.C. §1446(a), are annexed hereto as Exhibit A.

2

**WHEREFORE**, Mr. Billado respectfully requests this Honorable Court to:

A.    Exercise its jurisdiction over the claims asserted by the plaintiffs herein;

B.    Grant such other and further relief as may be just and proper.

Respectfully submitted,

**HARRY S. BILLADO**

By his attorneys,

**DEVINE, MILLIMET & BRANCH,
PROFESSIONAL ASSOCIATION**

Date: _5/31/05_

Steven E. Grill, Esquire
Timothy Bray, Esquire (BBO #652398 )
111 Amherst Street
Manchester, NH 03101
Telephone: (603) 669-1000
e-mail: sgrill@devinemillimet.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served via United States mail, first class, postage prepaid on this date upon David A. Brown, Esquire, Intruder, Inc. and Ames True Temper Company.

Date: _5/31/05_

Steven E. Grill, Esquire

3

| CIVIL ACTION COVER SHEET | b.L.S. | Trial Court of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Atlas Garden Supply LLC | Intruder, Inc., Ames True Temper Company, and Harry S. Billado |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Katy E. Koski; Sherin and Lodgen LLP; 617-646-2000 David A. Brown 101 Federal St., Boston, MA 02110 Board of Bar Overseers number 556161; 650613 | ATTORNEY (if known) |

**Origin Code**

**Original Complaint**

**TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| BL1 | Breach of Contract and Business Torts | ( B ) | (X) Yes    ( ) No |

**The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.**

This is a breach of contract, unjust enrichment, and trademark violation case involving the development, marketing and sale of a unique lawn product. Atlas owned the right to make, use and sell this product and also owned related trade names and improvements to the product.. Defendants have unlawfully manufactured and sold the product under Atlas' trademark and used Atlas' intellectual property without license or authority to do so. Defendants Intruder and Billado have breached various contractual obligations with respect to this product as well.

**\*A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.**

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record   _Katy E. Koski_                     DATE: 4/28/05

# Commonwealth of Massachusetts

**SUFFOLK, ss.**



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 05-1674

Atlas Garden Supply LLC
_____ , Plaintiff(s)

v.

Intruder, Inc., Ames True Temper Company,
and Harry S. Billado
_____ , Defendant(s)

## SUMMONS

To the above-named Defendant:   Harry S. Billado

You are hereby summoned and required to serve upon_____Katy E. Koski_____
    Sherin and Lodgen LLP

plaintiff's attorney, whose address is 101 Federal St., Boston, MA o2110 _____ , an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, S**Barbara J. Rouse** Esquire, at Boston, the_____28 th_____ day of
April _____ , in the year of our Lord two thousand __five__ .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT —(3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 3rd Rev.

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO.

---

ATLAS GARDEN SUPPLY LLC,

    Plaintiff,

v.

INTRUDER, INC., AMES TRUE TEMPER
COMPANY, AND HARRY S. BILLADO,

    Defendants.

---

## **COMPLAINT AND JURY DEMAND**

### **Introduction**

1. This is a breach of contract, unjust enrichment, and trademark violation case involving the development, marketing and sale of a unique lawn rake known as the "WaveRake" or the "Clog-Free Rake" (the "Rake"). On November 27, 1999, Atlas Garden Supply LLC ("Atlas") obtained, by License Agreement from its inventor, defendant Harry S. Billado ("Billado"), the rights to make, use and sell the Rake. Atlas improved the design of the Rake, had a manufacturing mold built for the Rake, and marketed the Rake to potential distributors under the trademark "Clog-Free Rake." Atlas has, at all times, owned the improvements to the Rake and the trademark, "Clog-Free Rake."

2. The defendants, Billado, Intruder, Inc. ("Intruder") and Ames True Temper Company ("Ames") have unlawfully manufactured and sold the Rake under the trademark "Clog-Free Rake" without license or authority from Atlas to do so.

3. Atlas seeks damages from all of the defendants for violation of Atlas' ownership rights in the improvements. Atlas seeks damages from Intruder for breach of contract, breach of the duty of good faith and fair dealing and indemnification.

00054714.DOC / 3

## Parties

4. Atlas Garden Supply LLC is a Massachusetts limited liability company with a principal place of business at 87 Terrace Hall Avenue, Burlington, Massachusetts.

5. Harry S. Billado is an individual whose principal residence is, upon information and belief, 249 Islington Street, Apt. #4, Portsmouth, New Hampshire.

6. Intruder, Inc., is a Wisconsin corporation with a principal place of business at 230 W. Coleman Street, Rice Lake, Wisconsin.

7. Atlas True Temper Company is, upon information and belief, a Delaware corporation with a principal place of business at 465 Railroad Avenue, Camp Hill, Pennsylvania.

## Factual Background

### A.    The Atlas License

8. On November 27, 1999, Atlas and Billado entered into a License Agreement (the "Atlas License") whereby Atlas became the exclusive licensee of a patented product known as the Waverake, and also known as the Clog-Free Rake, US Patent NO. 6009697. The Rake is also known as the Self-Cleaning Lawn Rake. A true and accurate copy of the Atlas License is attached hereto at Tab A.

9. Pursuant to the Atlas License, Billado granted an exclusive license to Atlas for the purposes of commercially developing, manufacturing and marketing the Rake throughout the world.

10. The Atlas License provided Atlas, the "Investor," with rights to improvements and associated trademarks and trade names, as follows:

> BILLADO acknowledges that all molds and tooling associated with the PATENTED PRODUCTS will be developed by, and shall remain the sole and exclusive property of the INVESTORS. In the event of the termination of this Agreement, the INVESTORS shall retain all tooling, and BILLADO shall have no claim to such tooling.

00054714.DOC / 3

2

> 3.2 BILLADO understands that INVESTOR may market and sell the
> LICENSED PRODUCTS throughout the world using the "WAVERAKE"
> trademark and trade name, or such other trademark or trade name as
> INVESTOR shall in its sole discretion determine. BILLADO hereby
> assigns any rights he may have to the "WAVERAKE" trademark or trade
> name to INVESTOR. **All other trademarks or trade names developed
> or used by the INVESTOR in connection with the PATENTED
> PRODUCTS shall be the sole and exclusive property of the
> INVESTOR.**

See Atlas License at §§ 3.1 and 3.2 (emphasis added).

11. The Atlas License further granted Atlas the authority to sublicense the development,

marketing and sale of the Rake at Atlas' discretion and without approval from Billado. See Atlas

License at § 5.1.

12. The Atlas License imposed upon Atlas an obligation to label the product with

Billado's patent information. Section 12.1 states:

> INVESTOR agrees to mark all PATENTED PRODUCTS sold or
> otherwise disposed of by it under this Agreement with the phrase "U.S.
> Patent No." or "U.S. Patents" (or with the appropriate patent designations
> in the foreign countries where the PATENTED PRODUCTS are sold) as
> well as the number or numbers of the issued LICENSED PATENTS
> applicable thereto, and until said patents are issued, with the phrase
> "Patent Pending."

13. Subsequent to November 27, 1999, Atlas invested significant capital to develop a

mold for the manufacture of the Rake. Atlas also spent significant sums in marketing the

product to potential distributors under the "Clog-Free Rake" trademark.

## B.    The Intruder Sublicense

14. On March 1, 2001, Atlas granted to Intruder an exclusive, worldwide license to

manufacture, market and distribute the Rake (the "Intruder Sublicense"). A true and accurate

copy of the Intruder Sublicense is attached hereto at Tab B.

15. The Intruder Sublicense granted to Intruder only a limited license to use or reproduce

Atlas' trademarks or tradenames. The Intruder Sublicense provides, in pertinent part, as follows:

00054714.DOC / 3

3

> During the Term of this Agreement Atlas hereby grants to the Licensee
> limited licenses to use and reproduce any Atlas trademarks or trade names
> as necessary for the purpose of allowing the Licensee to fully promote,
> distribute, market and sell the Lawn Rake in accordance with the terms
> and conditions of this Agreement. **Licensee expressly acknowledges
> that all rights with respect to the Atlas trademarks are reserved to
> and shall reside in Atlas...**

Intruder Sublicense at § 2(B) (emphasis added).

16. The Intruder Sublicense requires Intruder to mark or otherwise provide notice of

Atlas' proprietary rights and interests on the Rake:

> The Lawn Rake and all services that are marketed, sold or utilized in any
> manner within the license granted hereunder will bear a proprietary rights
> notice, in form and substance satisfactory to Atlas, not to be unreasonably
> withheld, which shall be sufficient in Atlas' judgment to protect its rights
> and interest in the rights granted by Atlas to Licensee pursuant hereto.
> Licensee further agrees to give proper notice of trademarks, patents or
> other copyrights, where applicable, in connection with the use of any
> rights hereunder.

Intruder Sublicense at § 2(C).

17. The Intruder Sublicense grants Intruder the right to use the Atlas mold and tooling to

manufacture the Rake and requires Intruder to use due care to maintain the mold and tooling:

> The Licensee shall have the right to utilize all existing molds and tooling
> in the possession of Atlas as of the date hereof (the "Mold") during the
> term of this Agreement, subject to Licensee's obligation to purchase the
> Mold under Section 14(A) (8) hereof. Licensee shall carefully maintain
> the Mold in its present condition, reasonable wear and tear accepted, and
> shall fully insure the Mold for its full replacement cost, naming Atlas as a
> loss payee. . .

Intruder Sublicense at §2(D).

18. Intruder was allowed to sublicense its rights under the Agreement only with the

express prior written consent of Atlas, provided that Intruder met certain minimum sales or

payment requirements under the Intruder Sublicense. See Intruder Sublicense at § 5. Any

sublicense granted by Intruder was made subject to the terms and conditions of the Intruder

Sublicense, which in turn was subject to the Atlas License. Id.

4

00054714.DOC / 3

19. Atlas expressly reserved all of its rights and ownership interest in the Rake and

trademarks. Section 7 of the Intruder Sublicense, provides:

> The parties acknowledge and agree that Atlas owns and will continue to
> own all right, title and interest in the Lawn Rake and Improvements
> [defined as: any and all improvements, refinements, enhancements and
> other modifications of the Lawn Rake, Intruder Sublicense, § 1(E)]
> including any and all copyrights, trade secrets, patents, know-how,
> designs, trademarks and other rights, including any trademarks or trade
> names utilized by Licensee in marketing the Lawn Rake. Nothing in this
> Agreement shall be construed to grant any ownership interest or other
> rights in the items described in this Section 7 other than the licenses and
> rights to use granted herein.

20. The Sublicense to Intruder further provides that any improvements Intruder may

make to the Rake are the property of Atlas:

> The Licensee shall promptly and fully disclose to Atlas all Improvements
> that it makes, conceives, invents or acquires. Any such Improvements that
> are made by the Licensee, whether patented or unpatented, shall be owned
> by Atlas, and Atlas shall grant back to the Licensee a license to use such
> Improvements according to the same terms and conditions set forth in this
> Agreement ...

Intruder Sublicense at § 8(B).

## C. The Ames Sublicense

21. On or about February 7, 2002, Intruder, with Atlas' consent and subject to the terms

and conditions of the Atlas License and Intruder Sublicense, entered into an exclusive sublicense

with Ames, the largest supplier of lawn and garden tools in the United States (the "Ames

Sublicense"). A true and accurate copy of the Ames Sublicense is attached hereto at Tab C.

22. Ames received the right to produce and sell the Rake in the United States, Canada and

Europe. See Ames Sublicense.

23. Ames had the right, under the Ames Sublicense, to "change colors, trade name and

other merchandising related characteristics of the product sold under the Ames True Temper

brand," and was responsible for "any modifications to the existing mold." Id. Pursuant to the

5

00054714.DOC / 3

terms of the Atlas License and the Intruder Sublicense, Atlas retains ownership of any such modifications or improvements to the mold.

24. Ames began manufacturing and selling the Rake to Wal-Mart Stores, Inc. ("Wal-Mart") under Atlas's "Clog-Free Rake" trademark, shortly following the execution of the Ames Sublicense.

25. On or about August 26, 2002, Atlas learned, through its counsel, that Wal-Mart was selling the Rakes without the proper patent markings as required by the Atlas License and the Intruder Sublicense. A true and accurate copy of the August 26, 2002 Letter from Donald J. Perreault to Margaret H. Paget is attached hereto at Tab D.

26. Immediately upon learning of this error, Atlas contacted its sublicensee, Intruder, and demanded that, pursuant to the terms of the Intruder Sublicense, the Rakes be marked as required in the Atlas License with the patent number on the Rakes directly or on their packaging.

27. Atlas made every effort to demand compliance with the terms of the Intruder Sublicense with respect to the proper marking of the Rakes with the appropriate patent information.

28. On or about September 24, 2002, Atlas received an email from Intruder with a proof of the new label prepared by Ames that was supposed to be affixed to all Rakes in the future. A true and accurate copy of the September 24, 2002 E-mail is attached hereto at Tab E. Intruder later informed Atlas that the labels were received and would be affixed to newly-manufactured Rakes.

29. Atlas learned that Ames had shipped approximately 90,000 Rakes to Wal-Mart and had approximately 11,000 Rakes in inventory "ready to ship," that is packed for shipment. None of these 101,000 Rakes were properly marked as required by the Intruder Sublicense. Atlas

6

informed Billado that all subsequently manufactured and packed Rakes would contain the new labels.

## D.   Termination of the Atlas License

30. On October 9, 2002, Billado's counsel sent a purported notice of termination of the Atlas License based on Ames' alleged failure to mark the patented products as required by § 12.1 of the Atlas License.

31. Atlas denied the validity of Billado's purported termination because Atlas had taken necessary steps within the time allowed by the Atlas License to cure the marking problem. This dispute was subject to arbitration, pursuant to the Atlas License. See Atlas License at Article XIII.

32. On or about October 31, 2002, Billado made a demand for arbitration with respect to the termination of the Atlas License.   The parties submitted the issue to arbitration in accordance with the terms of the Atlas License.

33. On or about August 21, 2003, the arbitrator determined that Atlas had breached Section 12.1 of the Atlas License by failing to properly mark the Rakes. A true and accurate copy of the Award of Arbitrator dated August 21, 2003 is attached hereto at Tab F.

34. By letter dated October 6, 2003, Atlas made demand upon Intruder for damages, indemnification, attorneys' fees and costs for Intruder's breach of the Intruder Sublicense, which caused the termination of the Atlas License. A true and accurate copy of the October 6, 2003 Letter from C. Forbes Sargent, III to David Nelson, General Manager of Intruder, is attached hereto at Tab G.

35. Atlas also informed Intruder that by the terms of the Intruder Sublicense, Intruder and its sublicensee must cease and desist their use of Atlas' trademarks, tradenames and improvements to the Rake. The letter provided:

> This letter is to formally advise Intruder that pursuant to the terms of the Agreement, Atlas hereby demands that Intruder and its licensees immediately cease and desist all use of the trademarks, trade names and improvements to the Lawn Rake, including the "Clog-Free Rake" trademark, and the Improvements to the Lawn Rake (namely the modifications to the original patented design) made by Ames. You are also hereby directed to assign all rights to the Clog-Free Rake trademark application, currently pending in the United States Patent and Trademark Office as Serial #7812 7587, to Atlas.
>
> Any continued use of any such trademarks, trade names, Improvements or otherwise will constitute willful infringement of Atlas' rights and subject Intruder and its licensees to damages. To the extent necessary, Atlas will also take any actions necessary to prevent Intruder and its licensees from unlawfully utilizing its trademarks.

Id.

36. That same day--October 6, 2003— Atlas informed Billado of its notification to Intruder to cease and desist the manufacture, marketing or sale of the Rake. A true and accurate copy of the letter from C. Forbes Sargent III to Donald J. Perreault dated October 6, 2003 is attached hereto at Tab H. Atlas also informed Billado that any use by Billado or any of his licensees of the "Clog-Free Rake" trademark or any of the improvements to the Rake will constitute infringement of Atlas' trademark and other intellectual property rights. Id.

37. Intruder, Billado and/or Ames have continued to manufacture, market and sell the Rake using Atlas', trademarks, tradenames and improvements without authority from Atlas. Ames continues to market the "Clog-Free Rake" in retail stores, on its own website and other internet venues.

38. Upon information and belief, Billado and Ames have entered into agreements to manufacture, market and sell the Rakes using Atlas' improvements. See Press Release a true and accurate copy of which is attached hereto at Tab I. None of these defendants has the right to do so without Atlas' consent.

39. Upon information and belief, Intruder, Billado and Ames are profiting or have profited from the improper use of Atlas' trademarks, tradenames, and improvements.

00054714.DOC / 3

8

## Count I
### (Breach of Contract v. Intruder)

40. Atlas realleges and incorporates the allegations contained in paragraphs 1 through 39.

41. Atlas has complied with and performed in accordance with all of the terms and conditions of the Intruder Sublicense.

42. Intruder's failure to properly mark the Rakes constitutes a breach of the terms of the Intruder Sublicense.

43. Intruder's failure to ensure that its sublicensee, Ames, properly marked the Rakes constitutes a breach of the terms of the Intruder Sublicense.

44. Intruder's failure to return all property owned by Atlas under the Intruder Sublicense, including but not limited to all Improvements, constitutes a breach of the terms of the Intruder Sublicense.

45. Intruder's failure to indemnify Atlas for its losses and expenses in connection with the Arbitration constitutes a breach of the terms of the Intruder Sublicense.

46. Intruder has breached its contractual obligations to Atlas.

47. As a result of the foregoing, Atlas has sustained damages and continues to sustain damages, including but not limited to lost royalty payments, lost profits, lost use of its improvements, trademarks and trade names, and injury to Atlas' business goodwill and reputation.

## Count II
### (Breach of Implied Covenant of Good Faith and Fair Dealing v. Intruder)

48. Atlas realleges and incorporates the allegations contained in paragraphs 1 through 47.

49. The Intruder Sublicense implies good faith and fair dealing between Atlas and Intruder. Pursuant to this implied covenant, neither of the parties to the Intruder Sublicense may

00054714.DOC / 3

9

do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

50. Intruder's actions, as described above, violate the implied covenants of good faith and fair dealing.

51. As a result of the foregoing, Atlas has sustained damages and continues to sustain damages, including but not limited to lost royalty payments, lost use of its property including trademarks and trade names, and damage to Atlas' business goodwill and reputation.

## Count III
## (Indemnification v. Intruder)

52. Atlas realleges and incorporates the allegations contained in paragraphs 1 through 51.

53. Pursuant to the Intruder Sublicense at Section 12, Intruder is obligated to provide indemnification and defense of Atlas for any losses arising out of the manufacture, marketing or sale of the Rake.

54. Atlas lost its license with Billado because of Intruder's failure to properly mark the Rakes and adequately supervise its sublicensee Ames as required by the Intruder Sublicense.

55. Atlas was forced to defend itself in arbitration with Billado, resulting in the loss of its license, thus entitling Atlas to indemnification from Intruder.

56. Atlas has incurred substantial damages in the form of lost profits arising out of the manufacture, marketing or sale of the Rake without Atlas' authority, thus further entitling Atlas to indemnification from Intruder.

## Count IV
## (Breach of Contract v. Billado)

57. Atlas realleges and incorporates the allegations contained in paragraphs 1 through 56.

58. Pursuant to the Atlas License, Atlas retains ownership of all trademarks and improvements made to the Rake even after the termination of the Atlas License.

59. Billado's failure to return all property owned by Atlas, including but not limited to all improvements, trademarks and trade names, constitutes a breach of the terms of the Atlas License.

60. Billado has breached its contractual obligations to Atlas.

61. As a result of the foregoing, Atlas has sustained damages and continues to sustain damages, including but not limited to lost royalty payments, lost profits, lost use of its improvements, trademarks and trade names, and injury to Atlas' business goodwill and reputation.

## Count V
## (Trademark Infringement v. All Defendants)

62. Atlas realleges and incorporates the allegations contained in paragraphs 1 through 61.

63. Atlas is the owner of certain trademarks pertaining to the Rake.

64. The Defendants, in manufacturing and distributing the Rake using Atlas' trademarks, subsequent to the termination of the Atlas License are in violation of 15 U.S.C. §§ 1051, 1114 (the "Lanham Act") and M.G.L. c. 110B.

65. The Defendants' intentional and unauthorized use of Atlas' trademarks has caused and will continue to cause damage to Atlas' business reputation and goodwill and the loss of revenue in the form of royalties or other payments that Atlas is entitled to.

## Count VI
## (Disgorgement and/or Restitution for Unjust Enrichment v. All Defendants)

66. Atlas realleges and incorporates the allegations contained in paragraphs 1 through 65.

67. One or more Defendants have been unjustly enriched insofar as they have benefited from the unlawful use of Atlas' trademarks and other intellectual property.

68. By wrongfully and inequitably using Atlas' trademarks and intellectual property, Defendants knowingly, intentionally, wrongfully, and inequitably seized an economic benefit

00054714.DOC / 3

11

from Atlas to Atlas' economic detriment. Defendants' economic benefit consists of the profits that were made or held, or are being held, at the direct, wrongful, and inequitable expense of Atlas. One or more Defendants made or held, or are holding, those profits through the unlawful, unfair, unconscionable, and inequitable means complained of herein and were or are unjustly enriched by those profits.

69. Atlas' losses during the periods alleged herein were directly and proximately caused by Defendants' inequitable conduct and one or more Defendants' unjust enrichment.

70. The monies that were inequitably made or held, or are inequitably being held, by one or more Defendants constitute unjust enrichment and are traceable, and rightly belong, to Atlas.

71. Atlas is entitled to the return, by way of disgorgement, restitution, divestiture, and/or other equitable remedy, of all proceeds that were unlawfully and inequitably made or held, or are unlawfully and inequitably being held, by one or more Defendants that are rightfully the property of Atlas.

## Count VII
## (M.G.L.c. 93A v. Billado)

72. Atlas realleges and incorporates the allegations contained in paragraphs 1 through 71.

73. Billado was engaged in the conduct of trade and commerce at all times relevant to this Complaint.

74. Billado's unauthorized use of Atlas' trademarks and improvements following termination of the Atlas License constitutes unfair and deceptive practices or acts in the conduct of trade or commerce in violation of G.L c. 93A, §§ 2 and 11.

75. Billado's unfair and deceptive acts and practices were knowing and willful.

76. As a result of Billado's violation of G.L. c. 93A, Atlas has sustained injury and is entitled to recover damages, including multiple damages and attorneys' fees.

00054714.DOC / 3

12

## Jury Demand

Atlas demands a jury trial on all issues so triable in this matter.

WHEREFORE, Plaintiff Atlas Garden Supply LLC prays that the Court:

a. Enter judgment in favor of Atlas on all Counts contained herein in an amount to be determined at trial;

b. Award Atlas multiple damages under G.L. c. 93A;

c. Award Atlas prejudgment interest at the statutory rate;

d. Award Atlas its reasonable attorney's fees and costs to the extent allowed by law; and

e. Award Atlas such other and further relief as the Court may deem just and proper.

**ATLAS GARDEN SUPPLY LLC**

**By its attorneys,**

David A. Brown, BBO# 556161
Katy E. Koski, BBO# 650613
Sherin and Lodgen LLP
101 Federal Street
Boston, Massachusetts 02110
617.646.2000

Dated: April 28, 2005

## LICENSE AGREEMENT

This Agreement is made and entered as of this 27 day of November, 1999 between Harry S. Billado, Jr. (hereinafter called "BILLADO") having a principle residence at 249 Islington Street, Apt. #4, Portsmouth, NH 03801, and *Atlar Grader Supply* , LLC (hereinafter called "INVESTOR"), a Massachusetts Limited Liability Company having a principle place of business at 87 Terrace Hall Avenue, Burlington, Massachusetts 01803.

### ARTICLE I - RECITALS

1.1  BILLADO has developed a rake (hereinafter the "WAVERAKE") and is the owner of certain proprietary rights to information concerning the design, development and use of the WAVERAKE.

1.2  INVESTOR is interested in entering into an agreement with BILLADO for the purposes of commercially developing, manufacturing and marketing the WAVERAKE throughout the world.

NOW, THEREFORE, for and in consideration of these following premises and other good and valuable considerations, the sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE II - DEFINITIONS

2.1  The "date of execution" of this agreement shall be the date on which this agreement is signed by BILLADO in the space provided below.

2.2  For purposes of this agreement, LICENSED PATENTS means any and all domestic and foreign patent rights, letters patent (including but not limited to patents of implementation, improvement, or addition, utility model and appearance design patents and inventors' certificates, as well as provisionals, divisions, reissues, continuations, renewals, and extensions of any of these), applications for Letters Patent (including US Patent Application, Serial Number 08/912,078) and Letters Patents which may issue on such applications for which BILLADO is at least one inventor relating to the self-cleaning rake, and any improvements or modifications thereto developed in whole or in part by BILLADO.

2.3  For purposes of this Agreement , PATENTED PRODUCTS means only rakes, or components thereof, manufactured and/or sold by INVESTOR or its sub-licensees utilizing the LICENSED PATENTS.

(CFS0274.WPD:4)

-1-

000066

2.4  For purposes of this Agreement, GROSS REVENUES shall mean the total, in U.S. Dollars, of all proceeds received by the INVESTOR from the sale or licensing of the PATENTED PRODUCTS during a reporting period, less credit for returns, sales, excise, and similar taxes , and third party shipping and freight charges. This figure will represent the cumulative total, in dollars, for that given reporting period.

## ARTICLE III - EXCLUSIVE LICENSE

3.1  BILLADO hereby grants to INVESTOR an exclusive license under said LICENSED PATENTS to make, use and sell PATENTED PRODUCTS in all countries throughout the world except those where sale of the PATENTED PRODUCTS is prohibited by the laws of the United States Government. BILLADO also hereby grants an exclusive license to INVESTOR to all know-how associated with the PATENTED PRODUCTS, including all data, technology, plans, research and other non-public information not included in the LICENSED PATENTS themselves. Further, BILLADO hereby grants an exclusive license to INVESTOR to utilize the video developed by BILLADO as well as all models, prototypes, drawings and other material in the possession of BILLADO or his agents relating to the WAVERAKE. BILLADO shall promptly forward all relevant inquiries regarding the PATENTED PRODUCTS or the LICENSED PATENTS to INVESTOR.

BILLADO acknowledges that all molds and tooling associated with the PATENTED PRODUCTS will be developed by, and shall remain the sole and exclusive property of the INVESTORS. In the event of the termination of this Agreement, the INVESTORS shall retain all tooling, and BILLADO shall have no claim to such tooling.

3.2 BILLADO understands that INVESTOR may market and sell the LICENSED PRODUCTS throughout the world using the "WAVERAKE" trademark and tradename, or such other trademark or tradename as INVESTOR shall in its sole discretion determine. BILLADO hereby assigns any rights he may have to the "WAVERAKE" trademark or tradename to INVESTOR. All other trademarks or tradenames developed or used by the INVESTOR in connection with the PATENTED PRODUCTS shall be the sole and exclusive property of the INVESTOR.

## ARTICLE IV - CONSIDERATION

4.1   In consideration of BILLADO's grant of the exclusive licenses under Section 3.1 above, INVESTOR will pay BILLADO eight percent (8%) of the GROSS REVENUES from sales or licensing of PATENTED PRODUCTS during the term of this Agreement.

(CFS0274.WPD;4)

-2-

000067

## ARTICLE V - SUBLICENSING

5.1   INVESTOR shall have the authority to grant any sublicense under this Agreement without express written consent of BILLADO, provided that INVESTOR then meets and continues to meet the minimum sales or payment requirements set forth in Section 7.3 of this Agreement.

## ARTICLE VI - REPORTING AND PAYMENT

6.1   To facilitate payment under Articles IV, V and VIII hereof:

(a)       INVESTOR agrees to make written reports to BILLADO quarterly within thirty (30) days after the first days of each January, April, July and October stating in each such report the total amount of GROSS REVENUES received by INVESTOR from the sale or licensing of PATENTED PRODUCTS, together with a calculation of the amount of the Royalty due under Sections 4.1, 5.1 and 8.1 hereof.

(b)       INVESTOR agrees to make payments to BILLADO based on the GROSS REVENUES identified in a report under Section 6.1 (a) above, according to the amounts set forth in Articles IV, V and VIII hereof, within thirty (30) days of such report.

## ARTICLE VII - TERM AND TERMINATION

7.1   Unless earlier terminated as hereinafter provided, this Agreement shall extend in each country for the duration of the patent registration in such country, or if no patent is obtained with respect to a particular country, for a period of 20 years from the date of first sale of any PATENTED PRODUCTS in such country.  In the event that the term of this Agreement shall expire as to sale of the PATENTED PRODUCTS in any particular country, the INVESTOR shall have the option to continue to use the LICENSED PATENTS for so long as INVESTOR shall continue to pay BILLADO the Royalty set forth in Sections 4.1, 5.1 and 8.1 of this Agreement. In such event INVESTOR shall continue to be the exclusive Licensee of BILLADO with respect to the LICENSED PATENTS in such country.

7.2   Prior to such time as the LICENSED PATENTS are assigned to INVESTOR pursuant to Section 8.1 hereof, if INVESTOR at any time defaults in making any payment or the making of any report under Article VI, or commits a substantial breach of any covenant herein contained, or makes any false report and fails to remedy any default, breach, or report within thirty (30) days after written notice thereof by BILLADO, BILLADO may at his option terminate any or all of the licenses to granted herein by notice in writing to such effect.

7.3   Prior to such time as the LICENSED PATENTS are assigned to INVESTOR

(CFS0274.WPD;4)

-3-

000068

pursuant to Section 8.1 hereof, in the event that sales of the PATENTED PRODUCTS worldwide for the years set forth below do not equal or exceed the amounts listed in TABLE 1, below, BILLADO shall have the right, upon sixty (60) days prior written notice to INVESTOR, to convert any and all licenses granted under this Agreement to nonexclusive licenses, subject to Section 7.4 below, and thereafter there shall be no requirement for minimum sales. INVESTOR may, however, maintain the exclusive character of its licenses, notwithstanding any such notice from BILLADO, if it shall, prior to expiration of the sixty (60) day notice period, pay to BILLADO a sum which, when added to the payments from INVESTOR to BILLADO for the year in question equals the Royalty amount to which BILLADO would be entitled based upon the sale of the number of units set forth on Table 1 at the average GROSS REVENUE per rake or components thereof received by the INVESTOR in such year, based upon sales of the PATENTED PRODUCTS. Failure of BILLADO to give the notice provided for in this Article in reference to any given year or years shall not constitute a waiver of the right to give such notice in reference to any subsequent year.

## TABLE 1

| Year* | Minimum Number of Rakes to be Sold |
|---|---|
| 1 | 25,000 |
| 2 | 100,000 |
| 3 and thereafter | 250,000 |

*Year 1 shall be deemed to be the eighteen (18) month period commencing upon the date the first rake is sold by INVESTOR or September 1, 2000, whichever is sooner. The following year shall be the 12 month period commencing at the end of such 18 month period.

From and after such time as the LICENSED PATENTS are assigned to the INVESTOR or a third party pursuant to Section 8.1 of this Agreement, in the event that sales of the PATENTED PRODUCTS worldwide for the years set forth in Table 1 above do not equal or exceed the minimum sales requirements for such year, BILLADO shall have the right upon sixty (60) days prior written notice to INVESTOR (or the third party if applicable), to convert the assignment granted pursuant to this Agreement to a non-exclusive license, in which case the INVESTOR shall assign all LICENSED PATENTS back to BILLADO. In the event that this agreement shall be converted to a non-exclusive license, the minimum sales requirements shall no longer apply. INVESTOR or the third party may, however, retain the assignment, and the exclusive rights thereunder notwithstanding any such notice from BILLADO if it shall, prior to the expiration of the sixty (60) day notice period, pay to BILLADO, the sum which, when added to the payments from INVESTOR and the third party to BILLADO for the year in question equals the Royalty amount which BILLADO would be entitled based upon the sale of the

(CFS0274.WPD;4)

-4-

000069

minimum number of units set forth on Table 1 at the average GROSS REVENUE received by the INVESTOR or such third party for such year. Failure of BILLADO to give the notice provided for herein in reference to any given year shall not constitute a waiver of the right to give such notice in reference to any subsequent year.

7.4    In the event that this license or any assignment under Section 8.1 shall for any reason hereafter become a non-exclusive license, BILLADO shall have the right thereafter to license the LICENSED PATENTS to any third party on an exclusive basis. In such event, BILLADO shall have the right, upon not less than thirty (30) days prior written notice to the INVESTOR to terminate this Agreement, and BILLADO'S sole obligation to INVESTOR in such event shall be to purchase the remaining inventory of PATENTED PRODUCTS from INVESTOR at INVESTOR'S cost.

## ARTICLE VIII - ASSIGNMENT OF PATENT RIGHTS TO INVESTOR

8.1.    In the event that INVESTOR and its affiliates and sublicensees shall either (a) pay to BILLADO $150,000 in royalties pursuant to Section 4.1 hereof, or (b) pay to BILLADO the difference between the actual royalties received by BILLADO under Section 4.1 hereof and $150,000.00, which payment in addition to existing royalties earned shall be treated as a non-refundable advance against future royalties (i.e., the INVESTOR shall have the right to pay a total of $150,000.00 in royalties and prepaid royalty payments to receive an assignment of LICENSED PATENTS) then, upon the first of  (a) or (b) to occur, this license shall automatically convert to an absolute assignment of all patent and other rights set forth in this Agreement, and in such event all royalties shall continue thereafter as provided in this Agreement, and in addition the INVESTOR shall be free to assign, convey and sell all the LICENSED PATENTS and all patent rights to such parties as it deems appropriate, subject to the payment terms set forth below, and in such case the consent of BILLADO shall not be required to such assignment.

In the event that the INVESTOR shall assign this Agreement or the LICENSED PATENTS to a third party, the payments to BILLADO shall be as follows:

(A)    In the event that the INVESTOR shall assign its rights under this Agreement to a third party, BILLADO shall receive eight percent (8%) of all Revenues received by INVESTOR from the assignment of the Agreement, and all Royalties shall thereafter continue to be paid to BILLADO by the assignee as provided in this Agreement; or

(B)    In the event that the INVESTOR shall assign the LICENSED PATENTS to a third party for a continuing royalty payment (without any up front payment) prior to the commercialization of the rake and the sale of the rakes through retail outlets

(CFS0274.WPD;4)

-5-

000070

(other than the Wal-Mart sales in the test period), the INVESTOR shall receive 70% and BILLADO shall receive 30% of all Royalty payments made by the assignee on account of such assignment, until such time as the total Royalty received by INVESTOR in such event shall equal $500,000.00. Thereafter, any further Royalty payments shall be divided equally between the INVESTOR and BILLADO; or

(C)    In the event that the INVESTOR shall assign the LICENSED PATENTS to a third party before or after the commercialization of the rake and the sale of the rakes through retail outlets (other than the Wal-Mart test period), for consideration which includes an up front payment as well as a continuing royalty payment, BILLADO shall receive eight percent (8%) of any up front payment received by the INVESTOR, and BILLADO and INVESTOR shall share equally in all future Royalty payments. In such event, the INVESTOR agrees that it shall not negotiate a Royalty arrangement with the assignee for less than 6% of assignee's GROSS REVENUES, as defined herein.

(D)    In the event that the INVESTOR shall assign the LICENSED PATENTS to a third party for a continuing royalty payment (without any up front payment) after the commercialization of the rake, INVESTOR and BILLADO shall divide all Royalty payments from such Assignment equally between the INVESTOR and BILLADO. In such event, the INVESTOR agrees that it shall not negotiate a Royalty arrangement with the assignee for less than 6% of assignee's GROSS REVENUES, as defined herein.

The assignment shall be in the form of Exhibit A attached hereto. In order to facilitate the assignment, BILLADO shall execute the assignment and place it in escrow with INVESTOR'S counsel, to be released upon the occurrence of any of the conditions set forth in this Section 8.1 without further act on the part of BILLADO. In the event that BILLADO shall receive a bona fide offer to transfer, sell or assign the LICENSED PATENTS prior to such time as the LICENSED PATENTS have been assigned to the INVESTOR pursuant to this Section 8.1, BILLADO shall advise the INVESTOR of the proposed terms of such assignment and INVESTOR shall have the right to exercise its option set forth in this Section 8.1 to prepay the minimum royalties and trigger the assignment to the INVESTOR. In the event that INVESTOR shall choose not to prepay such minimum royalties, BILLADO shall have the right to transfer, sell and assign the LICENSED PATENTS to such proposed purchaser upon the terms and conditions set forth in such notice to the INVESTORS, subject at all times to the terms and conditions of this License Agreement.

(CFS0274.WPD;4)

-6-

000071

## ARTICLE IX - PATENT APPLICATIONS

9.1  BILLADO acknowledges that he has filed a patent application for the LICENSED PATENTS relating to the WAVERAKE with the U.S. Patent Office, and such patent is pending as Serial Number 08/912,078.  BILLADO agrees to diligently prosecute such patent application at his own cost and expense.  In the event that INVESTOR shall determine, in its sole discretion, that BILLADO is not diligently prosecuting such patent application, then INVESTOR, upon 10 days prior written notice to BILLADO, may take over prosecution of such patent application in the name and on behalf of BILLADO, in which event all costs and expenses of such prosecution (including attorneys fees) shall be deducted from the Royalty payments due to BILLADO under Section 4.2 hereof.  During the term of this Agreement, additional patent applications for inventions relating to the WAVERAKE for which BILLADO is the inventor will be filed and prosecuted by BILLADO at the sole discretion of BILLADO.  Nothing in this Agreement obligates BILLADO to file any such additional patent applications, and INVESTOR, may, in its sole option and expense, file all other necessary patent applications in the US and in foreign countries in the name of BILLADO (or if after the date of assignment of PATENTS to INVESTOR, in its own name).

9.2  INVESTOR shall, during the term of this Agreement, undertake and pay all costs and expenses incurred by BILLADO in connection with the maintenance of LICENSED PATENTS and the preparation, filing, and prosecution of patent applications covering the current or future embodiments of the WAVERAKE, including attorney's fees, translation fees, and patent maintenance, annuity, filing and registration fees, except for the prosecution of US Patent Application Serial Number 08/912,078, which BILLADO has agreed to assume under Section 9.1 above.

## ARTICLE X - PATENT ENFORCEMENT AND INFRINGEMENT

10.1  INVESTOR, as exclusive licensee, shall have the power, but not the duty, to institute and prosecute, at its own expense, suits for infringement of the LICENSED PATENTS, and, if required by law, BILLADO will join as party plaintiff in such suits.  All expenses in such suits, including BILLADO's expenses as party plaintiff, will be borne entirely by INVESTOR, and INVESTOR will pay BILLADO eight percent (8%) of any excess of recoveries over attorney's fees, costs, and expenses in such suits.

## ARTICLE XI - INDEMNITY

11.1  BILLADO agrees to indemnify INVESTOR and to hold INVESTOR harmless against all loss, cost or damage (including reasonable attorneys fees) resulting from claims of third parties for loss or injury relating to claims of infringement resulting from making, using or selling products described and claimed in the LICENSED PATENTS , provided, however, that

(CFS0274.WPD;4)

-7-

000072

INVESTOR shall notify BILLADO promptly of any claim that is brought against INVESTOR and shall provide BILLADO with complete information and cooperation in defense or settlement of such claim. No settlement of claim shall be made by BILLADO without INVESTOR's prior written approval. BILLADO'S indemnification obligations hereunder shall be limited to the total amount of Royalties and other payments which BILLADO is entitled to hereunder from and after the date that INVESTOR or BILLADO is notified of a potential patent infringement claim with respect to the LICENSED PATENTS. BILLADO agrees that INVESTOR may set off any indemnification obligations hereunder against any payments due to BILLADO under this Agreement.

11.2  INVESTOR agrees to indemnify BILLADO and to hold BILLADO harmless against all loss, cost or damage (including reasonable attorneys fees) resulting from claims of third parties for loss or injury relating to claims arising from or in connection with the manufacturing, assembly, use or sale by INVESTOR of any PATENTED PRODUCTS, other than claims of infringements of patents licensed pursuant to this Agreement provided, however, that BILLADO shall notify INVESTOR promptly of any claim that is brought against BILLADO and shall provide INVESTOR with complete information and cooperation in defense or settlement of such claim.

## ARTICLE XII - LABELING

12.1  INVESTOR agrees to mark all PATENTED PRODUCTS sold or otherwise disposed of by it under this Agreement with the phrase "U.S. Patent No." or "U.S. Patents" (or with the appropriate patent designations in the foreign countries where the PATENTED PRODUCTS are sold) as well as the number or numbers of the issued LICENSED PATENTS applicable thereto, and until said patents are issues, with the phrase "Patent Pending".

## ARTICLE XIII - ARBITRATION

13.1  In the event of any dispute under this Agreement, the Parties, during the pendency of such dispute, will in good faith, except as otherwise provided in this Agreement, perform all other respective obligations without prejudice to the rights of any Party to the dispute. Any dispute or action for breach which cannot be resolved by agreement of the Parties shall be finally settled under the Rules of Conciliation and Arbitration of the American Arbitration Association by a single arbitrator, knowledgeable in commercial law and practices, appointed in accordance with such Rules. The place of arbitration shall be Boston, Massachusetts. The arbitration award shall be binding on the Parties and may be enforced in any court of competent jurisdiction. Nothing contained herein shall prevent either party from seeking preliminary relief in a court of competent jurisdiction pending the outcome of the arbitration award.

(CFS0274.WPD;4)

000073

## ARTICLE XIV - FORCE MAJEURE

14.1   The performance of this Agreement, including the minimum yearly royalties pursuant to Section 7.3 hereof, shall be suspended by either party in the event of: act of God, war, riot, fire, explosion, accident, flood, sabotage, lack of adequate fuel, power, raw materials, labor, containers, or transportation facilities; compliance with governmental requests, laws, regulations, orders or actions; breakage or failure of machinery or apparatus; national defense requirements, or in the event of labor trouble, strike, lockout or injunction; or any other event beyond the reasonable control of such party, which event prevents the performance of the terms and conditions of this Agreement.

## ARTICLE XV - WAIVERS AND MODIFICATIONS

15.1   No actual waiver of a breach by either party of any covenant or condition of this Agreement shall be construed to be a waiver of any succeeding breach of the same or any other covenant or condition.

## ARTICLE XVI - ASSIGNABILITY

16.1   This Agreement shall be binding to the benefit of BILLADO and his respective successors and assigns.

16.2   The rights and licenses granted by BILLADO in this Agreement are personal to INVESTOR and except as expressly provided in this Agreement, may not be assigned or otherwise transferred without the written consent of BILLADO until such time as the LICENSED PATENTS are assigned to INVESTOR pursuant to Section 8.1 of this Agreement, which consent shall not be unreasonably withheld or delayed. Any attempted assignment or transfer without such consent shall be void and shall automatically terminate rights of INVESTOR under this Agreement. From and after the assignment of the LICENSED PATENTS to INVESTOR pursuant to Section 8.1 of this Agreement, INVESTOR may in its sole discretion assign any rights granted under this Agreement to any third party, and in such event BILLADO's consent shall not be required.

## ARTICLE XVII - APPLICABLE LAW

17.1 This Agreement shall be construed, interpreted and applied in accordance with the laws of the Commonwealth of Massachusetts.

## ARTICLE XVIII - SEVERABILITY

18.1   If one or more or any part or individual provisions in this Agreement should be

(CFS0274.WPD;4)

-9-

000074

deemed contrary to law, then such provisions or parts thereof shall be null and void and shall be deemed separable from the remaining provisions or parts thereof and shall in no way effect the validity and enforceability of any remaining provision of this Agreement.

IN WITNESS WHEREOF, BILLADO and INVESTOR, the parties hereto, have personally executed or have caused duplicate originals of this Agreement to be executed, by a duly authorized person or officer.

_Harry S. Billado, Jr._

Harry S/ Billado, Jr.

Date: _November 15, 1999_

**INVESTOR**

_Sten (of the for investot group_

Name

President

Date: _11/27/99_

000075

the same to be held and enjoyed by ASSIGNEE for its own use and behalf and for its assignees, successors and legal representatives, to the full end of the terms for which United States Letters Patent have been granted, or of the terms of any continuations or divisions thereof, as fully and entirely as the same would have been held by ASSIGNOR had this assignment and sale not been made. This Assignment is subject to the terms and conditions of that certain License Agreement between Assignor and Assignee dated as of the date hereof.

ASSIGNOR will execute any and all additional documents which may be reasonably necessary in the opinion of counsel for ASSIGNEE to perfect the transfer of rights set forth herein; provided, however, that ASSIGNOR shall not incur any further financial obligations with respect thereto.

**Witness**

Thomas Murphy

**Print Name**

**Witness**

George Custolo

**Print Name**

Harry S. Billado, Jr.

(JB0637.WPD;2)

000077

STATE OF NEW HAMPSHIRE    )
                          )    ss.         November____,1999
COUNTY OF _____        )

On November ___, 1999, before me personally appeared Harry S. Billado, Jr., to me known, and known by me to be the same person described in and who executed the foregoing instrument, and acknowledged that he executed the same, of his own free will and for the purposes set forth.

_____
Notary Public
My commission expires: Sept 23 2001

(JB0637.WPD;2)

Jan-17-00 02:53P G&S Sales Associates          ...

Atlas Garden Supply LLC
C/o James J. Fox and Company
87 Terrace Hall Avenue
Burlington, MA 01803

Mr. Harry Billado
248 Islington Street #4
Portsmouth, NH C3801

Re: Amendment to License Agreement between Billado and Atlas Garden Supply LLC, license date November 30, 1999

Dear Harry,

This letter will serve as an amendment to the license agreement listed above. The amended language is as follows:

1. For the purpose of meeting the annual minimum number of rakes to be sold in years 1 through 5, each annual minimum in years 1 through 5 will be added together and that total will be 875,000 units. This sum will be considered as the cumulative rake sale minimum for years 1 through 5. If units sold in any or any part of years 1 through 5 exceed 875,000 units, then the minimum number of rakes to be sold for years 1 through 5 will be considered as met.

2. If 875,000 units have not been sold at the end of the fifth year the license will become non-exclusive.

3. Any shortfall in meeting annual rake sale unit minimums after year 5 shall be treated as described in Article VII.3.

This letter is agreed to by the parties and incorporated in the license agreement between Billado and Atlas Garden Supply LLC.

_____    01/17/00        _____    1/9/00
Harry Billado                Date           For Atlas Garden Supply LLC   Date

## SERVICES LICENSE AGREEMENT

This Agreement (the "Agreement") is entered into this 1st day of March, 2001 by and among Atlas Garden Supply LLC, a Massachusetts Limited Liability Company having its corporate offices at c/o James J. Fox and Company, 57 Terrace Hall Avenue, Burlington, MA 01803 (hereinafter referred to as "Licensor"), and Intruder, Inc., a Wisconsin Corporation, whose address is 230 W. Coleman Street, Rice Lake, WI 54868 (hereinafter referred to as "Licensee" or "Intruder")

### WITNESSETH

WHEREAS, Atlas is the holder of all of the rights, title and interest that are necessary for the grant of the license provided in this Agreement;

WHEREAS, Licensee has contracted for the right to manufacture, market and distribute the self cleaning Lawn Rake (hereinafter referred to as the "Product") on an exclusive and world-wide basis;

WHEREAS, Atlas wishes to grant to the Licensee and the Licensee wishes to obtain from Atlas an exclusive, worldwide license to manufacture, market and distribute the Product during the term of this Agreement as provided herein;

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants herein contained, the parties agree as follows:

1.    Definitions

As used in this Agreement, the following terms shall have the following meanings:

     (A)   Affiliate of any person or entity means another person or entity, of which the first person or entity owns, directly or through one or more Affiliates, capital stock or other ownership interests representing, on a fully-diluted basis, a majority of the total equity interests and a majority of the total equity voting power.

     (B)   Atlas means the limited liability company known as Atlas Garden Supply LLC.

     (C)   Customers means the customers who have purchased the Lawn Rake marketed and sold by or on behalf of Atlas or Licensee.

     (D)   Lawn Rake means a self-cleaning rake product being licensed and manufactured for sale.

1.    Definitions (continued)

     (E)   Improvements means any and all improvements, refinements,

000081

enhancements and other modifications of the Lawn Rake.

(F)    Licensee means Intruder, Inc., a Wisconsin corporation.

2.    Grant of Rights.

(A)    Atlas hereby grants to Licensee a worldwide license to manufacture, market and distribute the Lawn Rake during the term of this Agreement, which license shall be exclusive (subject to the rights of Atlas hereunder, if any).

(B)    During the term of this Agreement Atlas hereby grants to the Licensee limited licenses to use and reproduce any Atlas trademarks or trade names as necessary for the purpose of allowing the Licensee to fully promote, distribute, market and sell the Lawn Rake in accordance with the terms and conditions of this Agreement. Licensee expressly acknowledges that all rights with respect to the Atlas trademarks are reserved to and shall reside in Atlas. To the extent that approval or licenses to the foregoing trademarks and trade names are necessary from Affiliates of Atlas for the aforementioned purposes, such approval or licenses shall be obtained by Atlas within thirty (30) days from the execution of this Agreement without cost to Licensee.

(C)    The Lawn Rake and all services that are marketed, sold or utilized in any manner within the license granted hereunder will bear a proprietary rights notice, in form and substance satisfactory to Atlas, not to be unreasonably withheld, which shall be sufficient in Atlas' judgment to protect its rights and interest in the rights granted by Atlas to Licensee pursuant hereto. Licensee further agrees to give proper notice of trademarks, patents or other copyrights, where applicable, in connection with the use of any rights hereunder.

(D)    The Licensee shall have the right to utilize all existing molds and tooling in the possession of Atlas as of the date hereof (the "Mold") during the term of this Agreement, subject to Licensee's obligation to purchase the Mold under Section 14(A)8 hereof. Licensee shall carefully maintain the Mold in its present condition, reasonable wear and tear accepted, and shall fully insure the Mold for its full replacement cost, naming Atlas as a loss payee. Loss payee name will be removed from insurance once the mold is purchased by Licensee.

3.    Royalties, Reporting and Payment.

Licensee shall pay Atlas a royalty of Fifty Five Cents ($.55) per unit for the first 100,000 rakes sold, the royalty from 100,001 units sold and greater shall be Forty Five Cents ($.45) per unit sold and not returned. Payment of royalties shall be made accompanied by a written accounting report within thirty (30) days after the closing of each calendar quarter. Said reports shall include a calculation of the Royalties due and documents reflecting the number of units sold. Returns will be calculated per quarter and deducted from Royalties for that quarter.

2

000082

## 4.    Review

Atlas shall have the right, at any time during the term of this Agreement and for one (1) year after the closing of each calendar quarter, upon reasonable notice to the Licensee, to examine and make copies of all documentation, related to the marketing and sale of the Lawn Rake, at its own expense. Whenever two (2) years have elapsed from the time of closing, for any royalty period, that quarters royalty payment shall be considered closed, accepted and uncontestable by Atlas. If, through an audit of any disputed royalty period, it is determined and agreed that there exists a discrepancy, said discrepancy shall be cured within a Ten (10) day period. Atlas shall be responsible for it's own costs associated with any Audit, unless it is determined and agreed that there exists a discrepancy, in favor of Atlas, of more than Five Percent (5%), in which case, Licensee shall be responsible for such Audit costs.

## 5.    Sublicensing

Licensee shall have the authority to grant any sublicense under this Agreement with express prior written consent of Atlas, provided that Licensee is then meeting and continues to meet the minimum sales or payment requirements set forth in this agreement. Any sublicensee is subject to the same terms and conditions of this agreement.

## 6.    Confidentiality.

The Licensee shall maintain in strict confidence and shall not at any time whether before or after the termination of this Agreement utilize for any purpose other than as permitted under this License, or cause, enable, assist or permit anyone else to utilize the technology or design with respect to the Lawn Rake, Improvements and/or related information, including any and all information derived from the foregoing information (the "Confidential Information") that is not generally available to the public unless: (i) through no acts of the Licensee contrary to the obligations imposed hereby, such Confidential Information becomes known to the public prior to the date of this Licensee's disclosure; (ii) such Confidential Information is approved for public release by Atlas; (iii) such Confidential Information is rightfully received by the Licensee from a third party without restrictions and without breach of Licensee's obligations hereunder; (iv) such Confidential Information is independently developed by the Licensee without breach of this Agreement; (v) such Confidential Information is required to be disclosed by judicial or governmental proceeding subject to a protective order; or (vi) such disclosure is necessary or appropriate to the exploitation of the License granted hereby and only then after such person or entity to whom disclosure is to be made executes a confidentiality agreement acceptable to Licensee.

The Licensee understands and agrees that the obligations and restrictions provided herein are necessary and reasonable in order to protect Atlas' business, and that

3

000083

Atlas could be irreparably harmed by any breach or threatened breach hereof. In addition to any other remedies available, Atlas shall be entitled to obtain temporary, preliminary and permanent injunctive relief against a threatened breach or continuation of any such breach, without the necessity of proving irreparable injury, which injury shall be presumed.

Notwithstanding the foregoing, the Licensee may disclose such Confidential Information to their employees who need to know such information in order for the Licensee to market and distribute the Lawn Rake pursuant to the terms of this Agreement, if they have taken reasonable steps to impose the aforesaid covenants of confidentiality on said employees and to ensure that said employees will not violate said covenants, including, but not limited to, causing said employees to enter into written agreements in which said covenants of confidentiality are effectively imposed upon them. The Licensee will copy the Confidential Information only to the extent reasonably necessary to enable the Licensee to exercise their rights under the License. In making any such copies, the Licensee agrees to produce faithfully all notices respecting copyright, trade secrets, and other proprietary rights. Nothing contained herein shall prevent the Licensee from disclosing in general terms the nature of their relationship with Atlas.

7.    Ownership.

The parties acknowledge and agree that Atlas owns and will continue to own all right, title and interest in the Lawn Rake and Improvements including any and all copyrights, trade secrets, patents, know-how, designs, trademarks and other rights, including any trademarks or tradenames utilized by Licensee in marketing the Lawn Rake. Nothing in this Agreement shall be construed to grant any ownership interest or other rights in the items described in this Section 7 other than the licenses and rights to use granted herein.

8.    Improvements.

(A)    Atlas shall promptly and fully disclose to the Licensee all Improvements in the Lawn Rake that it makes, conceives, invents or acquires. Any such Improvements that are made by Atlas, whether patented or unpatented, shall be owned by Atlas, and Atlas shall grant to the Licensee a license to use such Improvements with the right to sub-license according to the same terms and conditions set forth in this Agreement.

(B)    The Licensee shall promptly and fully disclose to Atlas all Improvements that it makes, conceives, invents or acquires. Any such Improvements that are made by the Licensee, whether patented or unpatented, shall be owned by Atlas, and Atlas shall grant back to the Licensee a license to use such Improvements according to the same terms and conditions set forth in this Agreement. Atlas shall be responsible for maintaining the existing patent protection with respect to the Lawn Rake in the United States only. Licensee shall be responsible for all other worldwide patent and trademark

4

000084

protection for the Lawn Rake and any Improvements, which shall be obtained in the name of Atlas at Licensee's sole cost and expense.

9.    Representations and Warranties of Atlas.

Atlas represents and warrants to the Licensee, that as of the date of this Agreement:

(A)    Organization, Standing and Qualification. Atlas is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts, has all requisite corporate power and authority to own its property and assets and to carry on its business as it is currently being conducted.

(B)    Agreement Authorized; Binding and Enforceable. The execution, delivery, and performance of this Agreement has been duly authorized by all required corporate action on the part of Atlas. This Agreement is a valid, legal and binding obligation on Atlas, enforceable against it in accordance with its respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights and by equitable principles of general application which may limit the availability of certain equitable remedies (such as specific performance).

(C)    Rights to Atlas. Atlas represents and warrants that it is the holder of all rights, title, and interest, which is necessary for the grant of the license provided in this Agreement.

(D)    No Violation of Law. Atlas represents and warrants that to the best of its knowledge, the Lawn Rake will not violate any law or infringe upon or violate any rights of any person, firm, or corporation.

(E)    Consents. No consent, approval, license, permit, order or authorization by or declaration of filing with any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, or any third party, is required to be obtained or made by or with respect to Atlas in connection with the execution and delivery of this Agreement.

10.    Representations and Warranties of the Licensee.

The Licensee represents and warrants to Atlas that as of the date of this Agreement:

(A)    Organization Standing and Qualification. The Licensee is a Wisconsin Corporation duly organized, validly existing and in good standing under the

5

000085

laws of the State of Wisconsin, has all requisite power and authority to own its properties and assets and to carry on its business as currently being conducted.

(B)    Agreement Authorized Binding and Enforceable. The execution, delivery and performance of this Agreement have been duly authorized by all required action on the part of the Licensee. This Agreement is a valid, legal and binding obligation of the Licensee, enforceable against the Licensee in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights and by equitable principles of general application which may limit the availability of certain equitable remedies (such as specific performance).

(C)    Consents. No consent, approval, license, permit, order or authorization by or declaration of filing with any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, or any third party, is required to be obtained or made by or with respect to the Licensee in connection with the execution and delivery of this Agreement. The performance of the obligations under this Agreement by the Licensee does not conflict with any agreements with respect to which the Licensee may be a party.

(D)    The Licensee has received no representations or warranties from Atlas or any of its employees or agents regarding the projected results with respect to the sale and distribution of the Lawn Rake.

11.    Limitation of Liability

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN ATLAS SHALL NOT, UNDER ANY CIRCUMSTANCES, BE LIABLE TO THE LICENSEE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATED TO THE MARKETING AND SALE OF THE LAWN RAKE INCLUDING, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF BUSINESS, OR LOST REVENUE.

12.    Indemnity

Licensee shall indemnify, defend and hold harmless Atlas, its parent and Affiliated companies, successors and assigns, and each of their directors, officers, agents and employees, from and against all liabilities or losses, including, without limitation, reasonable attorneys' fees, arising out of any claims, lawsuits or judgments, whether threatened or actual, fixed or contingent, known or unknown, natural or unnatural, arising out of the manufacture, marketing or sale of the Lawn Rake .

Atlas shall indemnify, defend and

6

000086

hold harmless Licensee, its parent and Affiliated companies, successors and assigns, and each of their directors, officers, agents and employees, from and against all liabilities or losses, including, without limitation, reasonable attorneys' fees, arising out of any claims, lawsuits or judgments, whether threatened or actual, fixed or contingent, known or unknown, natural or unnatural, arising out of any claims that the United States Patent for the Lawn Rake infringes upon the patent rights of any third party.

Each party shall promptly inform the other in writing of any such claim, demand or suit and shall fully cooperate in the defense thereof. During the term of this Agreement Licensee shall maintain product liability insurance, in full force, in an amount not less than Two Million Dollars ($2,000,000) which includes coverage for Atlas, upon such terms and with such companies a are approved by Atlas, which approval shall not be unreasonably withheld or delayed.

13.    Enforcement.

    (A)    Notice. Each party shall notify the other of any conduct (of which that party becomes aware) by a third party that constitutes infringement of the patents and pending patents, trademarks, tradenames or other intellectual property rights with respect to the lawn Rake.

    (B)    ATLAS. If and when Atlas is granted a United States patent with respect to the Lawn Rake, Atlas shall have option to defend the US patent for the Lawn Rake against infringements or violations. In general, upon the discovery of any infringement of the US patent for the Lawn Rake, Atlas shall have the option to take appropriate action to suppress such infringement, including the sole right to determine whether or not any action shall be taken on account of such infringement or violation of the Lawn Rake, and the right to negotiate and enter into a pre-litigation or pending-litigation settlement with the identified infringer and Atlas shall receive any sums recovered in such suits or settlements. Any such settlement by Atlas may include the grant of a non-exclusive license to market and sell the Lawn Rake provided that no such license shall conflict with or limit, in any material respect, the Licensee's rights without the prior written consent of the Licensee, which consent shall not be unreasonably withheld or delayed. Licensee shall have the sole right to defend any foreign patents or trademarks with respect to any infringement thereof, and shall be solely responsible for all costs and expenses in connection therewith and shall receive any sums recovered in such actions.

Atlas shall from time to time consult with the Licensee in good faith with respect to any infringements and violations of the US patent, and if the Licensee so requests, will provide the Licensee with a reasonable opportunity to join Atlas in any action to suppress such infringement or violations near the onset of such suits, provided that in such event all costs, expenses, and attorneys fees incurred shall be shared equally between the parties herein and neither party shall settle any such action without the

7

consent of the other, which consent shall not be unreasonably withheld or delayed. In such a jointly prosecuted suit, any sums recovered in the suit or in settlement thereof, shall be used first, to pay any outstanding bills for expenses arising from the prosecution and any settlement of the suit, and then to reimburse the parties herein for their contributions to such expenses; and, then, any remainder, shall be shared equally by both Parties.

14.   Term and Termination.

(A)   Anything contained herein to the contrary notwithstanding, the rights and use licenses granted herein to the Licensee shall terminate, by a written notice sent by Certified Mail, from Atlas to Licensee, as provided within this Agreement, in the event that the Licensee fails to undertake any one or more of the following obligations which are not cured within the cure period set forth in Section 15 hereof:

1.   Sell 50,000 units in year one of this agreement 3/01/01 to 2/28/02.
2.   Sell an additional 100,000 units in the second year (03/01/02 to 2/28/03).
3.   Sell an additional 150,000 units in the third year (03/01/03 to 2/28/04).
4.   Sell an additional 200,000 units in the fourth year (03/01/04 to 2/28/05).
5.   Sell 250,000 units in every year thereafter.
6.   If Licensee fails to sell at least 875,000 rakes by 03/01/05, Licensee must pay $0.045 per rake, for the quantity representing the shortfall. For example, Licensee sells 800,000 rakes by 03/01/05. This represents a shortfall of 75,000 rakes. Therefore Licensee must pay $3,375 (75,000 X .045).
7.   If at any time the minimum sales are not met ( items 1-5 above) by Licensee, the Licensee may opt to pay Licensor the remainder of money owed to Licensor to meet the minimum sales for any year of the Agreement. This shall be the only cure available to Licensee in the event that they shall fail to meet the minimum number of units to be sold in any particular year.
8.   After Licensee reaches 100,000 Lawn Rake unit sales, Licensee must purchase the mold from Licensor for $50,000.00 to avoid termination of this Agreement. If sales minimums in the future are not met, or this Agreement is otherwise terminated by Atlas, Licensor has the option to purchase the mold back at the Licensee's original purchase price, less depreciation from the date hereof in accordance with generally accepted accounting principles ("GAAP").
9.   If Licensee does not promptly pay to Atlas any and all amounts as and when they are due under the terms of this Agreement.

In the event that Licensee does not meet any one or more of the above obligations, and this Agreement is terminated, the Licensee shall (i) deliver to Atlas within fifteen (15) days of termination, all tools, molds, dies, books, notes, product, drawings, writings and

8

000088

other documents or items, in the possession of the Licensee relating to the Lawn Rake and any Improvements, together with all copies of any other Confidential Information in the possession of the Licensee; (ii) immediately discontinue the manufacturing, marketing and sale of the Lawn Rake, and (iii) promptly assign any and all patents, trademarks, tradenames and other intellectual property rights with respect to the Lawn Rake to Atlas. Any remaining inventory can either be sold by Licensee or purchased by Licensor at Licensee's cost.

        (B)    Licensee shall have the right to terminate this agreement with 180 days notice to Licensor by written notice for any reason whatsoever but shall continue to make royalty payments for revenues which are received after such termination. In the event Licensee chooses to terminate this agreement at any time during the first year, Licensee agrees to pay licensor royalty on any product sold that year. In the event that Licensee shall terminate this Agreement during the 12 month period commencing on the date of this Agreement, Licensee shall be required to pay royalties to Atlas on a minimum of 25,000 units, even if a lesser amount is actually sold by Licensee during the period prior to termination. In the event of Licensee's termination of this Agreement under this section 14(B), Licensee shall promptly provide Atlas with the items and take all other action required under the provisions of the last paragraph of Section 14(A) as if this Agreement had been terminated on account of Licensee's breach.

## 15.    Cure Provision

        The failure of either party to perform any of its obligations hereunder shall not be deemed a breach of this Agreement unless the non-breaching party has given the breaching party written notice, by Certified Mail of such failure to perform (setting forth in reasonable detail the alleged default and the steps necessary to cure such default) and such failure is not corrected within thirty (30) days from and after receipt of such notice, or, if such breach is not reasonably capable of being cured within such thirty (30) day period, the breaching party does not commence to cure such breach within such thirty (30) day period and proceed with reasonable diligence to complete the curing of such breach promptly thereafter.

## 16.    Notices

        All notices, requests, consents and other communications herein shall be in writing and shall be mailed by certified mail, postage prepaid, or personally delivered or sent by overnight courier service that obtains evidence of delivery to the Party and its counsel as follows:

000089

If to Atlas:

Atlas Garden Supply LLC
87 Terrace Hall Avenue
Burlington, MA 01803

If to Licensee:

Intruder, Inc.
230 W. Coleman Street
Rice Lake, WI 54868

with copies to:

Forbes Sargent III
C/o Sherin and Lodgen
100 Summer Street
Boston, MA 02110

17.    Massachusetts Law.

        This Agreement and all matters or issues collateral thereto shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Massachusetts applicable to contracts made and performed entirely therein. All disputes with respect to the Agreement shall be subject to the exclusive jurisdiction of the state and Federal courts of the Commonwealth of Massachusetts.

18.    Integration.

        This Agreement, in the form executed by the parties thereto constitutes the entire agreement among the parties with respect to the subject matter hereof and supercedes all promises, representations and understandings made prior hereto or contemporaneously herewith with respect to the subject matter hereof.

19.    No Waiver

        No waiver by any of the parties, whether express or implied, of any provision of this Agreement or of any breach or default by any of the parties, shall constitute a continuing waiver or a waiver of any other provision of this Agreement, and no such waiver by any of the parties shall prevent such party from enforcing any and all provisions of this Agreement or from acting upon the same or any subsequent breach or default of one of the other parties. No waiver of any provision hereunder shall be effective unless it is in writing signed by the party against whom enforcement thereof is sought. Each party acknowledges that it has participated fully in the drafting of this Agreement and that in the event of any ambiguity in any of the terms or provisions

000090

hereof, no such ambiguity shall be construed against either party as the draftsperson thereof.

20.    Separability.

The provisions set forth in this Agreement shall be considered to be separable and independent of each other. In the event that any provision of this Agreement shall be determined in any jurisdiction to be unenforceable, such determination shall not be deemed to affect the enforceability of any other remaining provision and the parties agree that any court making such a determination is hereby requested and empowered to modify such provision and to substitute for such enforceable provision such limitation or provision or a maximum scope as court then deems reasonable and judicially enforceable and the parties agree that such substitute provision shall be as enforceable in said jurisdiction as if set forth initially in this Agreement. Any such substitute provision shall be applicable only in the jurisdiction in which the original provision was determined to be unenforceable.

21.    Relationship of the Parties.

Nothing contained herein shall be construed to place the parties in the relationship of partners or joint venturers and no party shall have the power to bind or obligate the other.

22.    Termination of Covenants, Representations and Warranties.

All covenants, representations and warranties contained herein or made in connection with the transactions contemplated hereby shall remain in effect for the duration of the Agreement, except as otherwise expressly provided herein.

23.    Assignment.

All of the terms of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successor and assigns of the parties hereto. The Licensee may not assign this Agreement in whole or in part without the prior written consent of Atlas.

24.    Miscellaneous. This Agreement may be executed in multiple counterpart originals which, when taken together, shall constitute a single binding agreement. The parties agree that a fax signature shall be deemed to be an original signature of that party for the purposes of this Agreement.

11

000091

03-19-2001 07:40AM    INTRUDER, INC.    715 254 9452    P.13

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

Licensee:    Intruder, Inc.

By: _____
Tom Martin — Vice President

ATLAS GARDEN SUPPLY LLC

By: _____

Title: HCMSM

12

P.013    TEL:617-272-6207    JAMES J. FOX & CO    19:07 (WED)11-19-'02    RXR
TOTAL P.13

000092

# ADDENDUM
## TO
## SERVICES LICENSE AGREEMENT
## BETWEEN
## ATLAS GARDEN SUPPLY, LLC
## AND
## INTRUDER, INC.

The parties are entering into this Addendum in order to clarify their understanding of the terms of the Services License Agreement between Atlas Garden Supply, LLC ("Atlas") and Intruder, Inc. ("Intruder") dated March 1, 2001 (the "Agreement"). The parties expressly agree that this is an acknowledgement of their understanding as of the date the Agreement was executed.

1.    Sublicense Agreement. Intruder recognizes that Atlas has licensed the patent rights to the Lawn Rake from the inventor, pursuant to a License Agreement dated November 27, 1999 between Atlas and Harry S. Billado, Jr. (the "Patent License Agreement"). As such, Intruder recognizes that it is a sublicensee of Atlas, as permitted under the terms of the Patent License Agreement. The parties acknowledge that the Agreement is not an assignment of Atlas' rights under the Patent License Agreement or an assignment of the Patent License Agreement. The parties expressly confirm that the nature of the sublicense was discussed at the time of the Agreement was entered into, and that the determination of the minimum units to be sold pursuant to Section 14 of the Agreement was disclosed to Intruder as necessitated by Atlas' agreement with the inventor pursuant to the terms of the Patent License Agreement.

2.    In some instances, under the terms of the Patent License Agreement, if the minimum royalties under the Patent License Agreement are not met, the rights of Atlas to license the patents relating to the Lawn Rake may become non-exclusive. In such event, Intruder recognizes that its rights to market and sell the Lawn Rake would be subject to the rights of the inventor to license the Lawn Rake to third parties. In the event that Atlas loses its license under the Patent License Agreement for any reason, then Intruder recognizes that the sublicense granted pursuant to the Agreement would be of no further force and effect.

3.    Where the Agreement specifies that Atlas owns any patent or other intellectual property rights to the Lawn Rake, Intruder expressly acknowledges that it was intended that this be read as "Atlas owns or licenses" any patent or other intellectual property rights.

4.    The reference in Section 14(B) of the Agreement relating to Intruder assigning intellectual property rights to Atlas in the event of the termination of the Agreement is intended to relate to any intellectual property rights (including patent) rights which Intruder may acquire as a result of their efforts to manufacture and market the Lawn Rake (including any rights to any improvements thereto), and is not intended in any way to grant Intruder any patent or other intellectual property rights, which are expressly reserved to Atlas and its licensor, as more fully set forth in Section 7 of the Agreement.

Except as expressly clarified in this Addendum, the Agreement shall remain in full force and effect. The parties expressly intend that this Addendum be effective for all purposes as of the date of the original Agreement notwithstanding that it may have been executed at a subsequent date.

IN WITNESS WHEREOF, the parties have executed this Addendum by their signatures set forth below.

ATLAS GARDEN SUPPLY, LLC

By: _____

_____
Witness

INTRUDER, INC.

By: _____

_____
Witness

2    {B1844.DOC/}

## CLOG-FREE RAKE AGREEMENT
### BY AND BETWEEN INTRUDER, INC. AND AMES TRUE TEMPER

Ames True Temper will have the right to produce and sell this product from the date of the agreement through 12/31/02 in the United States, Canada and Europe.

Ames True Temper will pay a royalty to Intruder of $.80 per unit sold.

Ames True Temper will have the right to change colors, trade name and other merchandising related characteristics of the product sold under the Ames True Temper brand.

Royalty payments will be made quarterly, within 30 days from the end of each calendar quarter and will be accompanied by a written accounting report. This report should include a calculation of the number of units sold.  Intruder has the right to audit detailed sales reporting without notice.

If Ames True Temper sells in excess of 75,000 units prior to 12/31/02, Ames True Temper will have a "Right of First Refusal", for year 2003.  2003 sales and each year after must maintain a minimum of 100,000 units per year to retain "Right of First Refusal".

If Ames True Temper pursues an agreement beyond 12/31/02, Ames True Temper will purchase the existing mold for $50,000.00.

All of the above conditions are contingent upon the existing mold tooling being capable of manufacturing product of normal quality levels at a cycle time of no more than 72 seconds per piece.

Ames True Temper will be responsible for any damage to the mold tooling beyond normal wear inherent in injection molding of this nature.

Any modifications to the existing mold will be the responsibility of Ames True Temper.

Intruder, Inc. By: _____        Date: __01/31/02__
                    Title - General Manager

Ames True Temper By: _____        Date: 2/5/02
                     Title – VP Engineering and Logistics

AGS_0318

08/26/2002 12:19 FAX                                                        ☑001

**GROSSMAN,TUCKER**
**PERREAULT&PFLEGER,PLLC**

**Intellectual Property Matters**

55 South Commercial Street
Manchester, NH 03101 USA
603-668-6560 Fax-668-2970
www.GTPP.com

Steven J. Grossman Ph.D. (NH)
Theresa C. Tucker (NH)
Donald J. Perreault (NH, MA)
Edmund P. Pfleger (AZ)
Scott R. Faber (PA)

Technical Specialist:
Richard D. Rhodes

08-26-02 P12:21 OUT

August 26, 2002
**VIA FACSIMILE**

Margaret H. Paget, Esq.
Sherin and Lodgen, LLP
100 Summer Street
Boston, MA 02110

      RE:    The Billado/Atlas "License Agreement" dated November 27, 1999

Dear Margaret:

On July 23, 2002, Mr. Billado sent an email to Walter Brauer identifying an error in Atlas' quarterly report and requesting correction of the same. As you know, the error relates to reporting of sales by Bostwick Braun. Bostwick Braun's sales were reported both late and inaccurately.

Atlas has not corrected this false report within the 30 days allowed for such correction pursuant to section 7.2 of the above-referenced agreement, which states:

      7.2. Prior to such time as the Licensed Patents are assigned to Investor pursuant to Section 8.1 hereof, if Investor at any time defaults in making any payment or the making of any report under Article VI, or commits a substantial breach or any covenant herein contained, or <u>makes any false report</u> and fails to remedy any such default, breach, or report <u>within thirty (30) days</u> after written notice thereof by Billado, Billado may at his option terminate any or all of the licenses to (sic) granted herein by notice in writing to such effect.

Of course, my client's position is that Atlas lost all rights under the above-referenced agreement when it attempted to exclusively license Intruder, Inc. To the extent that the terms of the agreement remain in force, then, pursuant to section 7.2, Mr. Billado hereby exercises his option to terminate all licenses granted under the agreement.

Moreover, Mr. Billado has just learned that the WaveRake is being sold at Walmart stores without Mr. Billado's patent number marked thereon as required by section 12.1 of the agreement. As discussed above, Atlas's rights have been lost. To the extent that Atlas intends to argue that its rights subsist, then it should remedy its failure to mark the rakes being sold at Walmart within thirty (30) days.

Margaret Paget, Esq.
August 26, 2002
Page 2 of 2

Your position relative to the issues in the arbitration is well known. Please advise as to Atlas' position with respect to Mr. Billado's exercise herein of his option under Section 7.2 to terminate all licenses granted under the agreement. Please also advise as to whether Atlas intends to correct its failure to mark the rakes being sold at Walmart.

Sincerely,

Donald J. Perreault

—— Original Message ——
From: "Mosansky, Luanne" <luamos@rfws.com>
To: <walterbrauer@ATTBI.com>
Sent: Tuesday, September 24, 2002 4:18 PM
Subject: Fwd: Clog Free Label w/ patent


>
> >From: "Allison, Jennifer" <Jennifer.Allison@amestruetemper.com>
> >To: "luamos@rfws.com" <luamos@rfws.com>
> >Subject: Clog Free Label w/ patent
> >Date: Tue, 24 Sep 2002 15:35:59 -0400
> >X-Mailer: Internet Mail Service (5.5.2653.19)
> >
> > <<40904.PROOF.pdf>>
> >
> >Here is the label with the patent#.  Thanks.
>

_____

----

>

CC:            "Margaret Paget" <MHPaget@sherin.com>

# MPI PROOF SUBMITTED FOR APPROVAL

**MPI LABEL SYSTEMS** 450 COURTNEY RD. • P.O. BOX 70 • SEBRING, OHIO 44672 • FAX#: (330) 938-9878 • PHONE: (330) 938-2134 • (800) 837-2134

| JOB#: | 40904 | CUST: | AMES TRUE TEMPER INC. | NOTES: SPEC # 72372 |
|---|---|---|---|---|
| ATTN: | OMAR AROCHO | FAX#: | | |
| FROM: | MELANIE McMINN-DUVALL | AUTH#: | | |

☐ Due to urgency, at your request, we have proceeded to plates and/or production and this proof is FOR YOUR FILE ONLY.

You are responsible for the accuracy of this proof. Please examine it carefully. Changes may have been made in the interests of more efficient prepress preparation, better printing or matters of a legal nature. This proof is not an exact representation of color or final print quality. Indicate your approval or changes by checking the appropriate block.
☐ The proof meets with my approval. Please proceed with my order.
☐ Make the change(s) indicated on the proof and proceed with my order.
☐ Make the change(s) indicated on the proof and re-proof for file only and proceed with my order.
☐ Make the change(s) indicated on the proof and re-proof.

Signature _____    Date _____
A telephone call or fax would expedite the order process but must be confirmed by mail with this signed proof approval.

50% reduction of original art



40904 September 4, 2003 12.625" x 10.0625"

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

In the Matter of the Arbitration between

Re: 11 E 133 02872 02:
    Harry S. Billado, Jr. (Claimant)
    and
    Atlas Garden Supply, LLC (Respondent)

## AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated November 27, 1999, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby AWARD as follows:

The patent license agreement between the parties is hereby terminated as requested by the Claimant, Harry Billado. Atlas Garden Supply's failure to mark some 90,00 rakes with notice of Mr. Billado's patent was a substantial breach. In accordance with the contract Atlas had 30 days to remedy the breach, which required it to begin marking, and to continue marking, all outgoing rakes so that by the end of the 30-day period it was no longer distributing unmarked rakes. It did not do this. The evidence showed that labels could have been obtained and affixed to the rakes still in inventory within the 30 days, that this was not a practical impossibility, and that the steps taken by Atlas and the sublicensees were insufficient to accomplish this. Although equity does not favor a forfeiture, where the contract provides a remedy, equity will not impose a different one.

The administrative fees and expenses of the American Arbitration Association ("the Association") totaling $1400.00, and the compensation of the arbitrator totaling $5470.25, shall be borne by the Respondent. Each party shall bear its own attorneys fees and cost. Therefore, the Respondent shall pay to Claimant the sum of $2745.25, representing its share of amounts previously advanced to the Association. These amounts reflect all payments made to date.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

_August 21, 2003_
Date

_Mary Allen Wilkes_
Mary Allen Wilkes

Commonwealth of Massachusetts }
               } SS:
County of Middlesex }

I, Mary Allen Wilkes, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_August 21, 2003_
Date

_Mary Allen Wilkes_
Mary Allen Wilkes

# Sherin AND Lodgen LLP

100 Summer Street Boston, MA 02110
T: 617.646.2000 F: 617.646.2222
www.sherin.com

C. Forbes Sargent III
Direct Dial: 617.646.2189
e-mail: cfsargent@sherin.com

October 6, 2003

## VIA CERTIFIED MAIL
## RETURN RECEIPT REQUESTED
### #7001 0320 0004 6262 4119

David Nelson, General Manager
Intruder, Inc.
230 W. Coleman Street
Rice Lake, WI 54868

**Re:    Breach of Agreement with Atlas Garden Supply LLC**

Dear Mr. Nelson:

This letter is to advise you that Atlas Garden Supply, LLC ("Atlas") is seeking damages from Intruder, Inc. ("Intruder") pursuant to the March 1, 2001 Services License Agreement between Atlas and Intruder (the "Agreement"). The Agreement entitles Atlas to recover losses from Intruder's breach of its obligations, as well as to indemnification for losses arising from the marketing and sale of the rake (hereinafter the "Lawn Rake"). Because Intruder (1) failed to comply with its obligation to ensure that the Lawn Rakes were sold with a notice of patent, and (2) this failure resulted in arbitration proceedings against Atlas, and termination of Atlas' exclusive license with the inventor of the Lawn Rake, Intruder is now obligated to reimburse Atlas its attorneys' fees and costs incurred in the arbitration, as well as its lost royalties. Intruder's obligations to Atlas are more fully set forth below.

1. Intruder's Breach of Agreement.

Pursuant to the terms of the Agreement, Intruder was required to mark the Lawn Rake with a patent notice, and other proprietary rights notices. Section 2(c) of the Agreement provides as follows:

"(C) The Lawn Rake and all services that are marketed, sold or utilized in any manner within the license granted hereunder will bear a proprietary rights notice, in form and substance satisfactory to Atlas, not to be unreasonably withheld, which shall be sufficient in Atlas' judgment to protect its rights and interest in the rights granted by Atlas to Licensee pursuant hereto. Licensee further agrees to

{TF4425 DOC /}

Sherin AND Lodgen LLP

Intruder Inc.
October 6, 2003
Page 2

> give proper notice of trademarks, patents or other copyrights, were applicable, in
> connection with the use of any rights hereunder." (Emphasis added)

While Intruder initially sold some rakes with the proper patent notice, all of the rakes manufactured and sold by its sublicensee, Ames True Temper, Inc. ("Ames") until at least May, 2003 failed to contain the proper patent notice. Intruder's failure to mark the Lawn Rakes with the patent notice, and its failure to assure that its sublicensee, Ames, properly marked the Lawn Rake with the patent notice, resulted in the termination of Atlas' rights under its license with the inventor of the Lawn Rake, Harry Billado ("Billado") on August 21, 2003. Intruder's breach of its obligations to mark the Lawn Rakes has resulted in substantial damages to Atlas, namely the amounts which Atlas would have earned had it continued to hold its exclusive license with Billado for the duration of the patent period. Based upon Ames' anticipated sales for Fall 2003 to Spring 2004 of in excess of 600,000 units, at the Royalty due to Atlas under the Agreement of $0.45 per rake (less 8% to be paid to Billado), Atlas' lost revenues in Fall 2003 to Spring 2004 alone are anticipated to be in excess of $138,000.

Atlas notified Intruder of its breach of the Agreement on or about August 26, 2002. Despite such notice, Intruder did not cure the breach within 30 days thereafter or commence to cure such breach within such 30-day period and "proceed with reasonable diligence to complete the curing of such breach promptly thereafter" as is required under the Agreement. In fact, Atlas learned that although Intruder's sublicensee designed sample replacement labels within the 30-day notice period, they did not actually attach the replacement labels to any rakes until some time this year, over nine (9) months after Atlas notified Intruder of the failure to properly mark the rakes. Atlas also learned that Intruder's sublicensee had rakes in its warehouse during the 30-day notice period but failed to properly mark the rakes in its possession at such time.

Intruder's material breach of the Agreement has resulted in damages to Atlas in the hundreds of thousands of dollars over the expected life of the Lawn Rake patent.

Under Massachusetts law, which governs this matter, Intruder is responsible to Atlas for damages that it suffered as a result of Intruder's material breach of the Agreement.

2. Intruder is Obligated to Indemnify Atlas for Losses or Liability Arising from the Manufacture, Marketing or Sale of the Lawn Rake.

In addition, pursuant to the provisions of Section 12 of the Agreement, Intruder is required to indemnify Atlas for any losses resulting from "any claims" arising out of the manufacture, marketing or sale of the Lawn Rake. Since the termination of Atlas' License Agreement with Billado was a direct result of the "manufacture, marketing or sale of the Lawn Rake" without the proper patent notice, Intruder is also required to indemnify Atlas for any losses resulting therefrom, including reasonable attorneys fees.

{TF4425.DOC /}

# Sherin AND Lodgen LLP

Intruder Inc.
October 6, 2003
Page 3

Atlas hereby makes a formal demand for indemnification for its losses resulting from Intruder's marketing and sale of the Lawn Rake without the required patent notice, including all attorneys' fees.

### 3. Atlas' Ownership of Lawn Rake Trademarks and other Intellectual Property Rights.

As you may also be aware, Section 7 of the Agreement provides for Atlas to own "all right, title and interest in the Lawn Rake and Improvements including any and all copyrights, trade secrets, patents, know-how, designs, trademarks and other rights, including any trademarks or tradenames utilized by Licensee in marketing the Lawn Rake."

This letter is to formally advise Intruder that pursuant to the terms of the Agreement, Atlas hereby demands that Intruder and its licensees immediately cease and desist all use of the trademarks, tradenames and improvements to the Lawn Rake, including the "Clog-Free Rake" trademark, and the Improvements to the Lawn Rake (namely the modifications to the original patented design) made by Ames. You are also hereby directed to assign all rights to the Clog-Free Rake trademark application, currently pending in the United States Patent and Trademark Office as Serial #7812 7587, to Atlas.

Any continued use of any such trademarks, tradenames, Improvements or otherwise will constitute willful infringement of Atlas' rights and subject Intruder and its licensees to damages. To the extent necessary, Atlas will also take any actions necessary to prevent Intruder and its licensees from unlawfully utilizing its trademarks.

### 4. Conclusion.

Unless Intruder provides Atlas with reasonable assurances that it will (a) compensate Atlas for its damages resulting from Intruder's failure to mark the Lawn Rakes with the patent notice; (b) undertake its indemnification obligations, and (c) compensate Atlas for any continued use of its trademarks within thirty (30) days from the date of this letter, Atlas will have no choice but to file an action against Intruder in the Massachusetts Courts seeking to recover its damages to the fullest extent provided by law.

Please contact me to avoid any further action by Atlas at this time.

Sincerely,

C. Forbes Sargent III

CFS:tjf

cc:    Atlas Garden Supply LLC
       Margaret H. Paget, Esq.
{TF4425.DOC /}

# Sherin AND Lodgen LLP

COUNSELLORS AT LAW
100 Summer Street  Boston, MA 02110
T: 617.646.2000  F: 617.646.2222
www.sherin.com

C. Forbes Sargent III
Direct Dial:  617.646.2189
e-mail:  cfsargent@sherin.com

October 6, 2003

Donald J. Perreault, Esquire
Grossman, Tucker, Perreault & Pfleger, PLLC
795 Elm Street, Suite 604
Manchester, NH 03101

> Re:   Atlas Garden Supply, LLC ("Atlas")

Dear Mr. Perreault:

In light of the Arbitrator's decision in the recent arbitration between our clients, Atlas has notified Intruder, Inc. as its licensee, that it no longer has any license to manufacture, market or sell the lawn rake, and that Intruder and its licensees should discontinue any manufacture, marketing or sale of the lawn rake as well. Since we understand that your client may wish to contact Intruder or its licensee, Ames True Temper, Inc. to license the lawn rake directly, we wanted to take this opportunity to advise you of certain terms of Atlas' Agreement with Intruder (the "Intruder Agreement"). Pursuant to Section 7 of the Intruder Agreement, Atlas owns the "Clog-Free Rake" trademark and tradename under which the lawn rake has been marketed. Pursuant to Section 7 of the Intruder Agreement Atlas also owns all rights to any improvements to the lawn rake over Mr. Billado's original design, namely the modifications to Mr. Billado's design made by Ames, which we understand include making the bracing rails thinner and changes to the area where the rake head meets the handle.

Section 7 of the Intruder Agreement provides as follows:

"7. Ownership.

The parties acknowledge that Atlas owns and will continue to own all right, title and interest in the Lawn Rake and Improvements including any and all copyrights, trade secrets, patents, know-how, designs, trademarks and other rights, including any trademarks or tradenames utilized by Licensee in marketing the Lawn Rake. Nothing in this Agreement shall be construed to grant any ownership interest or other rights in the items described in this Section 7 other than the licenses and rights to use granted herein."

{JB2830.DOC /}

# Sherin AND Lodgen LLP

Donald J. Perreault, Esquire
October 6, 2003
Page 2

Thus, any use by Mr. Billado, or any of his licensees of the "Clog-Free Rake" trademark , or any of the improvements, will constitute infringement of Atlas' trademark and other intellectual property rights. To the extent that Mr. Billado or his licensees desire to continue to use the "Clog-Free Rake" trademark or the improvements, Atlas would be happy to discuss a reasonable royalty rate.

Please note that Atlas takes the misuse of its trademarks and other intellectual property rights seriously, and will take any and all steps necessary to enjoin the use of these rights by any and all infringers. In the event that Atlas and Mr. Billado are unable to reach an acceptable agreement as to a proper royalty within thirty (30) days from the date of this letter, Atlas will take any and all actions necessary against Mr. Billado, Intruder, Ames or any third party to prevent the continued infringement of its intellectual property rights and seek damages with respect to such infringement.

We trust such actions will not be necessary. Please contact me at your earliest convenience if you wish to discuss this further.

Very truly yours,

C. Forbes Sargent III

CFS:jab

cc:    Atlas Garden Supply, LLC
       Margaret H. Paget, Esq.

{JB2830.DOC /}





Our Firm | Practice Areas | Our Attorneys | News | Cont

# GROSSMAN,TUCKER
## PERREAULT&PFLEGER,PLLC





**GTPP Refines IP Expertise:**
**Brian J. Colandreo Joins As New Junior**
**Partner**
GTPP continues to forge its reputation as one of the region's most innovative IP firms with the addition of Brian J. Colandreo as a new junior partner.

Colandreo specializes in U.S. and international patent protection for innovations in the electronic, electrical, electro-mechanical and software arts including Internet portals, software and utilities; networking and data transmission security and encryption algorithms; machine and fault-tolerant system design; IR- and EMF-based 3D positioning systems; and medical devices, among others.

He holds a BS degree in Electrical Engineering from New Jersey Institute of Technology, has worked as a systems and software engineer for Johnson Controls, and holds a JD and MIP from Franklin Pierce Law Center, where he is an adjunct professor.
Colandreo joins an exceptionally well-rounded GTPP team of science, technology and engineering experts that provides clients with an unmatched portfolio of legal and technical expertise; senior-level service and personal attention that is a model in the IP sector.

**GTPP Wins Arbitration Award in Pate**
**License Dispute**
On August, 22, 2003, GTPP partner, Don: Perreault, achieved a victory for Harry S. I in an arbitration proceeding emanating fro license dispute.

Mr. Billado invented a unique lawn rake cc which allows users to rake leaves and oth while preventing the debris from being lod rake head. This unique design received U No. 6,009,697.

Mr. Perreault represented Mr. Billado in ar seeking to terminate a license of rights un patent due to breach of the license. Follow and hearing on the matter, Mr. Billado rec judgment terminating the license, along w award of administrative fees and expense

Mr. Perreault has since guided Mr. Billado consummation of a new license under the the largest manufacturer of lawn and gard equipment in the world, Ames True-Temp Through these efforts, Mr. Billado's patent been made available in Home Depot, Low Wal-Mart Stores throughout the United St

**GTPP Partner Honored As "Best In C**
**Engineering School Students**
Dr. Steven Grossman, a founding partner Grossman, Tucker, Perreault & Pfleger ar professor in University of Massachusetts I Department of Plastics Engineering, has t selected by students as the Outstanding F Engineering Faculty Member for the 2002 academic year.

Dr. Grossman teaches in the field of polyr materials, as well as offering survey cours intellectual property for engineers. He has numerous technical articles in the field of ; engineering and holds several U.S. paten: be honored at the Department's scholarsh awards assembly later this month.

## INTELLECTUAL PROPERTY MATTER

55 South Commercial Street, Manchester, NH 03101 USA 603-668-6560 Fax-

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Atlas Garden Supply, LLC

**DEFENDANTS**

Intruder, Inc., Ames True Temper Company and Harry S. Billado

**(b)** County of Residence of First Listed Plaintiff  Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
David A. Brown, Esquire, Sherin & Lodgen, LLP
101 Federal Street, Boston, MA 02210 (617) 646-2000

Attorneys (If Known) for Harry S. Billado, Steven E. Grill, Esquire
Devine, Millimet & Branch, P.A., 111 Amherst Street,
Manchester, NH 03101; (603) 669-1000

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

Appeal to District

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. Section 1332
Brief description of cause:
breach of contract, unfair competition and related federal and state statutory claims

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 5/31/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)_____ Atlas Garden Supply, LLC v. Intruder, Inc.,
Ames True Temper Company and Harry S. Billado

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

| | | |
|---|---|---|
| ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
| ☐ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121<br>740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.   for patent, trademark or copyright cases |
| ☑ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,<br>315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,<br>380, 385, 450, 891. |
| ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,<br>690, 810, 861-865, 870, 871, 875, 900. |
| ☐ | V. | 150, 152, 153. |

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES ☐   NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

YES ☐   NO ☑

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES ☐   NO ☑

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES ☐   NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES ☑   NO ☐

A.   If yes, in which division do all of the non-governmental parties reside?

Eastern Division ☑   Central Division ☐   Western Division ☐

B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division ☐   Central Division ☐   Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES ☐   NO ☑

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Steven E. Grill, Esquire
ADDRESS   Devine, Millimet & Branch, P.A., 111 Amherst Street, Manchester, NH 03101
TELEPHONE NO.   603.669.1000

(CategoryForm.wpd - 5/2/05)