UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
------------------------------------ x
                                     :
ATLAS GARDEN SUPPLY, LLC,            :
                                     :
                    Plaintiff,       :
                                     :
       vs.                           :   Civil Action No. 05-cv-11122-JLT
                                     :
INTRUDER, INC., AMES TRUE TEMPER     :
COMPANY AND HARRY S. BILLADO         :
                                     :
                    Defendant.       :
                                     :
------------------------------------ x
```

## ANSWER TO COMPLAINT

Harry S. Billado, by his attorneys, Devine, Millimet & Branch, Professional Association, answers the Complaint of the plaintiff as follows:

1.   Answering paragraph 1, Mr. Billado states that the first sentence of said paragraph is merely plaintiff's characterization of its own lawsuit and as such, requires no response. Mr. Billado admits that he entered into a License Agreement with Atlas on or about November 27, 1999 but affirmatively alleges that said License Agreement was terminated due to plaintiff's breach thereof, as found in the arbitration award dated August 21, 2003 (annexed to the Complaint as Exhibit F); admits that Atlas made a manufacturing mold for the Rake and engaged in some marketing with respect to the same; and, except as expressly so admitted, denies the remaining allegations of said paragraph.

2.   Mr. Billado denies the allegations of paragraph 2.

3.   Answering paragraph 3, Mr. Billado states that said paragraph merely contains plaintiff's own characterization of its lawsuit and, as such, no response is required.

4. Mr. Billado admits the allegations of paragraph 4.

5. Answering paragraph 5, Mr. Billado denies that the address stated is his correct legal address and affirmatively alleges that he is a citizen of the State of Florida.

6. Mr. Billado denies knowledge or information sufficient to form a belief of the matters alleged in paragraph 6 and, therefore, denies the same.

7. Mr. Billado admits the allegations of paragraph 7.

8. Answering paragraph 8, Mr. Billado denies the allegations that his patented Rake is "known as" either the "Waverake," the "Clog-Free Rake," or the "Self-Cleaning Lawn Rake," but admits the remaining allegations of said paragraph 8.

9. Answering paragraph 9, Mr. Billado admits that the now-terminated Atlas License granted an exclusive License to Atlas, said grant was not unconditional, and it has already been adjudicated that Atlas breached the terms and conditions thereof. Mr. Billado refers all other questions regarding the content, meaning and legal effect of the now-terminated Atlas License to the Court.

10. Answering paragraph 10, Mr. Billado admits that plaintiff has accurately quoted from two clauses of the Atlas License, and refers all questions regarding the content, meaning and legal effect of said provisions to the Court. Mr. Billado expressly denies that the Atlas License granted plaintiff "rights to improvements" or to "associated trademarks and tradenames," as alleged and affirmatively alleges that the effect of the quoted clauses was merely to waive any rights of ownership in "molds and tooling" and in the "'Waverake' trademark." Mr. Billado also denies that any other valid trademarks or trade names have ever been developed by plaintiff.

11. Answering paragraph 11, Mr. Billado refers all questions regarding content, meaning and legal effect of the provisions of the Atlas License to the Court, and denies that the Atlas License contained an unconditional grant of "authority to sublicense."

12. Answering paragraph 12, Mr. Billado admits that plaintiff has accurately quoted from Section 12.1 of the Atlas License.

13. Answering paragraph 13, Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter as alleged and, therefore, denies the same.

14. Mr. Billado admits the allegations of paragraph 14.

15. Answering paragraph 15, Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter as alleged and refers all questions regarding content, meaning and legal effect of the so-called Intruder Sublicense to the Court.

16. Answering paragraph 16, Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter as alleged and refers all questions regarding content, meaning and legal effect of the so-called Intruder Sublicense to the Court.

17. Answering paragraph 17, Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter as alleged and refers all questions regarding content, meaning and legal effect of the so-called Intruder Sublicense to the Court.

18. Answering paragraph 18, Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter as alleged and refers all questions regarding content, meaning and legal effect of the Intruder Sublicense to the Court.

19. Answering paragraph 19, Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter as alleged and refers all questions regarding content, meaning and legal effect of the Intruder Sublicense to the Court.

20. Answering paragraph 20, Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter as alleged and refers all questions regarding content, meaning and legal effect of the Intruder Sublicense to the Court.

21. Mr. Billado admits the allegations of paragraph 21.

22. Mr. Billado admits the allegations of paragraph 22.

23. Answering paragraph 23, Mr. Billado refers all questions regarding content, meaning and legal effect of the Ames Sublicense to the Court, denies knowledge or information sufficient to form a belief as to the truth of the matter as alleged, and expressly denies that plaintiff owns or could possibly own any "improvements" to the patented product.

24. Answering paragraph 24, Mr. Billado admits that Ames began manufacturing and selling the Rake to Wal-Mart Stores, but denies that any such manufacturing or selling occurred at any time under "Atlas's 'Clog-Free Rake' trademark."

25. Mr. Billado admits the allegations of paragraph 25.

26. Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 26 and therefore denies the same.

27. Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 27 and therefore denies the same.

28. Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 28 and therefore denies the same.

29. Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matters alleged in paragraph 29 and therefore denies the same.

30. Mr. Billado admits the allegations of paragraph 30, but objects to the use of the word "purported" to modify the phrase "notice of termination," in that the notice of termination

has been held to be valid by an arbitrator's award which is annexed to the Complaint as Exhibit F.

31. Mr. Billado admits that Atlas denied that Mr. Billado had validly terminated the Atlas License and that a dispute thus arose, but denies the remaining allegations of paragraph 31.

32. Mr. Billado admits the allegations of paragraph 32.

33. Mr. Billado admits the allegations of paragraph 33.

34. Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter alleged in paragraph 34 and, therefore, denies the same.

35. Mr. Billado denies knowledge or information sufficient to form a belief as to the truth of the matter alleged in paragraph 35 and, therefore, denies the same.

36. Answering paragraph 36, Mr. Billado admits that his counsel received the letter from plaintiff's counsel as alleged in said paragraph, but refers all questions regarding the content, meaning and legal effect of said letter to the Court.

37. Answering paragraph 37, Mr. Billado expressly denies that he has manufactured, marketed or sold anything. The only thing that he had done is license his patent to Ames in accordance with the License Agreement is annexed hereto as Exhibit A and incorporated herein. Mr. Billado further denies that Atlas owns any trademarks, trade names or improvements with respect to Mr. Billado's patented product.

38. Answering paragraph 38, Mr. Billado admits that he entered into the patent License Agreement annexed to this Answer as Exhibit A but denies plaintiff's allegation that it owns "improvements" and also denies plaintiff's absurd assertion that Mr. Billado, as patent owner, required plaintiff's consent before entering into the patent License Agreement and,

indeed, expressly avers that such allegations are frivolous and asserted in violation of Rule 11 of the Massachusetts and Federal Rules of Civil Procedure.

39.     Answering paragraph 39, Mr. Billado asserts that as reflected in the patent License Agreement annexed hereto as Exhibit A, the only thing Mr. Billado is "profiting" from is his patent, which he has validly licensed to Ames, and he therefore denies the allegations of paragraph 39.

40.     Answering paragraphs 40 through 47, Mr. Billado responds that such paragraphs do not purport to assert a claim for relief against him and, therefore, no response is necessary.

41.     Answering paragraphs 48 through 51, Mr. Billado responds that such paragraphs do not purport to assert a claim for relief against him and, therefore, no response is necessary.

42.     Answering paragraphs 52 through 56, Mr. Billado responds that such paragraphs do not purport to assert a claim for relief against him and, therefore, no response is necessary.

43.     Answering paragraph 57, Mr. Billado repeats, realleges and incorporates herein by reference each and every admission, denial and other response to paragraphs 1 through 56 of the Complaint as though fully alleged herein.

44.     Answering paragraph 58, Mr. Billado denies that plaintiff owns any trademarks or improvements made to the Rake.

45.     Answering paragraph 59, Mr. Billado denies that he has failed to return any property owned by Atlas and affirmatively alleges that he has never had possession or control of any property owned by Atlas, and any allegation to the contrary is patently frivolous.

46.     Mr. Billado denies the allegations of paragraph 60.

47.     Mr. Billado denies the allegations of paragraph 61.

48. Answering paragraph 62, Mr. Billado repeats, realleges and incorporates herein by reference each and every admission, denial and other response to paragraphs 1 through 61 of the Complaint as though fully set forth herein.

49. Mr. Billado denies the allegations of paragraph 63.

50. Mr. Billado denies the allegations of paragraph 64.

51. Mr. Billado denies the allegations of paragraph 65.

52. Answering paragraph 66, Mr. Billado repeats, realleges and incorporates herein by reference each and every admission, denial and other response to paragraphs 1 through 65 of the Complaint as though fully alleged herein.

53. Mr. Billado denies the allegations of paragraph 67.

54. Mr. Billado denies the allegations of paragraph 68.

55. Mr. Billado denies the allegations of paragraph 69.

56. Mr. Billado denies the allegations of paragraph 70.

57. Mr. Billado denies the allegations of paragraph 71.

58. Answering paragraph 72, Mr. Billado repeats, realleges and incorporates herein by reference each and every admission, denial and other response to paragraphs 1 through 71 of the Complaint as though fully alleged herein.

59. Mr. Billado denies the allegations of paragraph 73.

60. Mr. Billado denies the allegations of paragraph 74.

61. Mr. Billado denies the allegations of paragraph 75.

62. Mr. Billado denies the allegations of paragraph 76.

**As and for his affirmative defenses,**

63. The License Agreement annexed hereto as Exhibit A is the only agreement entered into between Mr. Billado and any of the other agreements following the termination of the Atlas License Agreement pursuant to the arbitrator's award which is annexed to the Complaint as Exhibit F. Plaintiff knew, or should have known, that Mr. Billado was well within his rights to enter into such a license agreement and that Mr. Billado has not licensed, or purported to license, anything other than the intellectual property (which he plainly owns).

64. Plaintiff also knew, or should have known, that it cannot claim any right to patent improvements because it has never applied for patent protection with respect to the same, and more than a year has now passed.

65. Plaintiff also knew, or should have known, that its statutory and common law claims with respect to alleged patent improvements are preempted by the federal patent laws and, therefore, do not state a claim upon which relief can be granted.

66. For all of the above reasons, the allegations of plaintiff's Complaint are not well grounded in law or in fact and have not been asserted for a proper purpose.

67. This Court lacks jurisdiction over the person of Mr. Billado, in that – other than the specious claim of breach of a terminated contract which has been asserted against him – none of the other alleged acts or omissions complained of by plaintiff have any nexus to the Commonwealth of Massachusetts and is no valid basis for the exercise of either general or specific in personam jurisdiction.

68. Plaintiff's claims against Mr. Billado are barred by the equitable doctrine of unclean hands.

Respectfully submitted,

**HARRY S. BILLADO**

By his attorneys,

**DEVINE, MILLIMET & BRANCH,
PROFESSIONAL ASSOCIATION**

Date:  January 17, 2006            \_\_/s/ Steven E. Grill, Esquire_____
                                  Steven E. Grill, Esquire (admitted pro hac vice)
                                  Danielle L. Pacik, Esquire (BBO #653753)
                                  111 Amherst Street
                                  Manchester, NH 03101
                                  Telephone:  (603) 669-1000
                                  e-mail:  sgrill@devinemillimet.com

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served via the Court's Electronic Case Filing management system upon David A. Brown, Esquire, Katy Ellen Koski, Esquire, Daniel J. Kelly, Esquire, Edward William Little, Jr., Esquire and Anthony M. Moccia, Esquire.

Date:  01/17/06                    \_\_/s/ Steven E. Grill,  Esquire_____
                                  Steven E. Grill, Esquire

J:\wdox\docs\clients\16430\74011\M0808872.DOC

9

# LICENSE AGREEMENT

THIS AGREEMENT (hereinafter called the "Agreement") is made effective as of October 1, 2003 (hereinafter called the "Effective Date")

BETWEEN:

**HARRY S. BILLADO, JR.**, an individual having a place of residence at 249 Islington Street, Suite 4, Portsmouth, NH 03801 (hereinafter called the "Licensor")

OF THE FIRST PART

And

**AMES TRUE TEMPER, INC.**, a corporate body having an address at 465 Railroad Avenue, Camp Hill, Pennsylvania, USA 17011 (hereinafter called the "Licensee")

OF THE SECOND PART.

WHEREAS the Licensor is the holder of U.S. Patent No. 6,009,697 (the "Patent").

And

WHEREAS the Licensee desires to obtain an exclusive license to make and sell rakes in the US and Canada utilizing the Patent Property (such rakes being hereinafter referred to as "Licensed Products") and Licensor is willing to grant such a license to the Licensee subject to the terms and conditions set forth hereinafter:

NOW THEREFORE IN CONSIDERATION the parties hereto hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1 In this Agreement the following words and expressions shall have the meanings attributed to them, respectively:

    (a)    **"Patent Property"** means:

        (i)    U.S. Patent No. 6,009,697 entitled *Self Cleaning Rake* which issued January 4, 2000.

(b)  **"Affiliate"** means any wholly or partially owned subsidiary of Licensee, and any person, firm, corporate or other legal entity, under the control of Licensee.

(c)  **"Royalty"** or **"Royalties"** means an amount of money payable to the Licensor by the Licensee calculated:

>   Units Sold Between   0 and 150,000         $.50/Rake
>   Units Sold Between 150,001 and 300,000     $.45/Rake
>   Units Sold Between 300,001 and 600,000     $.40/Rake
>   Units Sold Between 600,001 and Up          $.34/Rake

>   **The period of time for the Royalty period will run between October 1 to September 30. Payments will be made quarterly. Each October 1 the unit count starts at zero.**

(d)  **"Sold"** or **"Sale"** means the first arms length transactions pursuant to which the Licensee or any Affiliate shall sell, convey, manufacture, or otherwise transfer ownership of each Licensed Product. For greater clarification, any transaction between the Licensee and any Affiliate shall be considered non-arms length and the transaction, which shall constitute a "Sale", will be the first transaction where the buyer is not an Affiliate of the Licensee.

# ARTICLE 2
# GRANT

2.1  **Exclusive License**

Under the terms and subject to the conditions set forth herein, Licensor hereby grants to Licensee and Licensee accepts an exclusive license (with no right to sublicense), to manufacture, offer for sale, sell, use and import Licensed Products throughout the United States and Canada. Notwithstanding the foregoing sublicensing prohibition, Licensor understands and acknowledges that Licensee shall be allowed to use, employ and contract with independent third parties, consultants, manufacturers and subcontractors during the Term of this Agreement which are necessary for properly developing, manufacturing, marketing, distributing and selling the Licensed Product.

# ARTICLE 3
# LICENSEE OBLIGATION

3.1 **License Performance**

Throughout the Term of the Agreement Licensee agrees to devote reasonable and sufficient funds, personnel and commercial efforts to actively and continually manufacture, distribute, market, sell and exploit the Licensed Product.

# ARTICLE 4
# ROYALTIES, REPORTS AND PAYMENTS

4.1 **Royalties**
Licensee shall pay to the Licensor an earned Royalty of the amounts referred in 1.1 (c) in United States currency, for each unit of Licensed Product sold in the United States and Canada.

4.2 **Reports**

    (a)    Licensee shall keep accurate books of account and records of all Licensed Product sold under this Agreement for enabling the Royalties payable hereunder to be determined and shall provide reports to the Licensor quarterly based on units sold beginning Oct 1 of each year during the Term of this Agreement for all sales of Licensed Product to that date. As a minimum, such report shall show the transaction for each customer account, without revealing the actual names of the Licensee's customers, indicating the units of Licensed Product sold to each account and Royalties due to Licensor up to that date accompanied by a payment, by check, to Licensor for all Royalties then due.

    (b)    Throughout the Term of this Agreement Licensee shall provide to Licensor annually on November 15th a signed certification from Licensee's controller, or an Officer of the Licensee, setting forth correct and accurate numbers of Licensed Product sold during each individual year of this Agreement.

4.3 **Payments**

    (a)    Payment of Royalties owing to Licensor shall be delivered by express courier no more than THIRTY (30) days after quarter end with the first quarter beginning October 1, i.e. first royalty payment to be received by January 31, with subsequent payments to be made no later than April 30, July 31 and October 31of each year during the Term of this Agreement. In the event any of the Royalty payments are not made as and when due,

        interest shall accrue thereon at the rate of TWELVE PERCENT (12%) per annum, compounded annually, and the Licensor shall, at their election, have the option of enforcing any rights they may be entitled to, at law, equity or otherwise.

(b)    Licensee shall keep accurate books of account, provide reports and make payments to the Licensor quarterly between October 1 and September 30 of each year during the Term of this Agreement for Royalties owing to Licensor for Licensed Product sold since the last received report and payment. As a minimum, such reports shall show the transaction for each customer account, without revealing the actual names of Licensee's customers, indicating the units of Licensed Product sold to each account and Royalties due to Licensor for that payment period.

(c)    Licensee shall keep accurate books of account and provide reports to the Licensor for each quarterly payment made between October 1 and September 30 of each year during the Term of this Agreement including listing any Royalty offset for each applicable customer account separately. Such Royalty offset will be deducted from the Royalty payable to Licensor.

# ARTICLE 5
# REPRESENTATIONS AND WARRANTIES

5.1    **Representations and Warranties**

    The Licensor hereby represent and warrant that:

(a)    to the best of the Licensor's knowledge, the Patents comprise a valid and issued Patent in the United States of America; and

(b)    to the best of the Licensor's knowledge, each of the claims in the Patents is valid and enforceable and does not constitute an infringement of any intellectual property rights of any third party.

Other than as specifically set forth above, the Licensor makes no other representations or warranties whatsoever with respect to the Patent Property.

# ARTICLE 6
# TERM

6.1 **Term**

The initial "Term" of this Agreement shall commence on the Effective date and, unless sooner terminated as provided herein, shall expire simultaneously with the expiration of the longest-lived patent comprised within the Patent Property (hereinafter called the "Term"). The start date and end date of each year goes along with the royalty payment schedule.

# ARTICLE 7
# TERMINATION

7.1 **Default**

This Agreement may be terminated by either party by giving written notice of termination/cancellation to the other party (the "Defaulting Party") in the event the Defaulting Party is in material breach of the Agreement and has failed to cure such breach of failure within SIXTY (60) days of receipt of written notice thereof from the first party.

7.2 **Minimum Sales**

Either party shall have the right to terminate this Agreement by giving written notice of termination to the other party in the event sales of Licensed Product drop below TWO HUNDRED THOUSAND (200,000) units per year for TWO (2) consecutive years.

7.3 **Waiver**

The waiver of any default under this Agreement by the Licensor shall not constitute a waiver of the right to terminate/cancel this Agreement for any subsequent or like default, and the exercise of the right of termination/cancellation shall not impose any liability by reason of termination/cancellation nor have the effect of waiving any damages to which Licensor might otherwise be entitled.

7.4 **Rights**

Termination/cancellation of this Agreement, shall be in addition to all other rights and remedies of Licensor, at law or in equity, and shall in no matter interfere with, affect or prevent the collection by Licensor of any and all sums of money due to it under this Agreement.

 LICENSE AGREEMENT

7.5   **Licensee Obligations**

Upon the expiration or termination of this Agreement for any reason whatsoever:

(a)   Licensee shall immediately cease to exploit the Licensed Product in any manner whatsoever; and

(b)   All tooling, molds, jigs, dies and other hardware developed by or possessed by Licensee that is/are limited to the production of the Licensed Product shall be offered for sale to Licensor by Licensee at a reasonable price. Licensee shall not otherwise make use of, deal with or dispose to a third party of any of the foregoing tooling, molds, machines, jigs, dies and other hardware.

(c)   Notwithstanding the expiration or termination of this Agreement, the provisions of Article 4 and Section 9.1 and Section 12.1 of this Agreement shall continue in full force and effect.

## ARTICLE 8
## PATENT MAINTENANCE

8.1   **Maintenance**

Licensor will bear all costs for the preparation, filing, prosecuting and maintaining of the Patent Property. Licensor shall in a timely manner keep Licensee fully apprised of all developments in connection with any Patent applications and any resultant Patents, including Office actions, proposed responses, Patent issuances, payment of Patent Maintenance Fees, and any awareness of any challenges to the Patent Property of claims adverse thereto.

8.2  **Abandonment**

In the event that the Licensor elects to abandon a pending Patent application or fails to maintain an issued Patent, Licensor shall then give Licensee notice of such intention and provide an opportunity for the Licensee to assume full responsibility for such Patent Property or Patent and obtain title thereto, at no charge to Licensor, but at the expense of the Licensee in respect of all reasonable out-of-pocket expenses and goodwill. Not withstanding any transfer of rights to the Licensee, the Licensee shall remain obligated to pay Royalties to the Licensor and otherwise perform the Licensee's obligations hereunder.

8.3  **Improvements**

Improvements to the invention disclosed and claimed in Patent Property made by the Licensor shall be disclosed to Licensee promptly and Licensee may elect to add said improvements to this Agreement subject to the terms and conditions hereof, by giving Licensor notice of such election within THIRTY (30) days of Licensee's receipt of disclosure of said improvements from Licensor.

# ARTICLE 9
# PATENT PROTECTION

9.1  **No Challenges**

Each of the Licensee and the Licensor agree that they shall not at any time take any steps to encumber, challenge, impugn or derogate from the Patents or the validity thereof.

9.2  **Notice**

In the event the Licensee or Licensor becomes aware that others without benefit of a License are infringing the Patent(s) or any rights granted pursuant to this Agreement, the party obtaining such information shall immediately give written notice to the other party, providing full particulars thereof.

9.3  **Infringement**

(a)  In the event any information is brought to the attention of Licensor or Licensee that others without benefit of a licenses are infringing the Patent(s) or any of the rights granted pursuant to this Agreement, the Licensee shall have the right to defend the Patent(s) and Licensor in prosecuting such infringement, at its own expense, by notifying Licensor in writing of its election to so prosecute the same within THIRTY (30) days of receipt of notification of such infringement. In the event Licensee elects to pursue and/or prosecute the infringement they must obtain written consent from


LICENSE AGREEMENT

Licensor to proceed with prosecution which consent may be withheld in Licensor's sole discretion. Licensor shall be entitled to receive reimbursement of all its costs from any proceeds arising from such pursuit and/or prosecution and to the extent there remains any positive balance, Licensee shall pay Licensor a FIVE PERCENT (5%) Royalty on such balance and retain the remainder.

(b) In the event Licensee elects not to pursue and/or prosecute the infringement Licensor may in its sole discretion, at its own expense, participate in any such matters.

(c) Licensee shall have the right to diligently and vigorously defend, at its own expense, all infringement suits that may be brought against it or any Affiliate arising from its manufacture, use or sale of Licensed Product.

9.4    **Patent Support**

The Licensor agrees to provide the Licensee with reasonable assistance in connection with any challenges to the Patents and/or any Patent infringement litigation pursued against third parties by the Licensee. Any such support and assistance by the Licensor will be on a reasonable basis and at the sole cost and expense of the Licensee. In addition, and not withstanding that the Licensee shall have primary responsibility for any litigation, in the even of any challenge to the validity of any Patent Property the Licensor shall have the right to defend the same.

9.5    **Invalidity**

In the event of a final judgment or decree of a court of competent jurisdiction for which no appeal is or can be taken that any claim of a particular Patent included in the Patent Property in a specific country is invalid, Licensee shall have no obligation to pay Royalties based on the claim that has been invalidated from and after the date of entry of said final judgment or decree. In the even the parties are unable to agree on a new adjusted Royalty rate either party shall be entitled to terminate this Agreement with no further obligation on either party except the payment of any Royalties due.

9.6    **Intellectual Property Notice**

Licensee agrees to place such trademark, copyright and patent notices on all advertising and packaging of the Licensed Product as necessary to protect and preserve Licensor's Patent rights.

# ARTICLE 10
# DELIVERIES TO LICENSOR

**10.1  Prototypes**

On October 1st of each year of the Term of this Agreement (or first ship date of that Winter season, whichever is later) Licensee shall supply and deliver to the Licensor, at the expense of the Licensee, FIVE (5) units of each Licensed Product marketed for sale in that particular season.

# ARTICLE 11
# PRODUCT LIABILITY

**11.1  Indemnification**

Licensee agrees to defend, at its sole cost and expense and to indemnify and hold Licensor harmless from and against all loss, costs, expenses (including legal fees), damages and liabilities, however caused resulting directly or indirectly from the conduct of Licensee's business, including but not limiting to the manufacture, distribution and sale of the Licensed Product. This indemnity includes but is not limited to claims by users of the Licensed Product that the Licensed Product is defectively designed or manufactured or that they have caused injury or illness. Licensee shall maintain in full force and effect during the Term of this Agreement, product liability insurance consistent with industry standards, in such form, in such amounts, which such coverage's and with such company(ies) as Licensee shall deem necessary in Licensee's reasonable opinion so as to adequately protect Licensee and the Licensor. All such coverage(s) shall name the Licensor and shall be non-cancelable without first providing Licensor with at least SIXTY (60) days prior written notice. A certificate evidencing coverage shall be delivered to Licensor within THIRTY (30) days of the commencement of the Term.

# ARTICLE 12
# GENERAL

**12.1  Notices**

Any notice or other communication give to the terms of this Agreement shall be in writing and shall be validly communicated by the delivery thereof to its addressee, either personally, by fax or by certified or registered mail, to the address mentioned

 LICENSE AGREEMENT

hereinafter or to any other address of which either of the parties may notify to the other. Any such notice or other communications given by certified or registered mail shall be deemed to have been received THREE (3) working days after mailing. In the event of an interruption in postal service, such notice or other communication shall be delivered personally or by courier service.

Addresses for notices are as follows:

(a)  to Harry S. Billado, Jr.:
     249 Islington Street, Suite 4
     Portsmouth, NH 03801

(b)  to Ames True Temper, Inc.
     465 Railroad Avenue
     Camp Hill, Pennsylvania
     USA 17011
     Fax: (717) 737-2554
     Attention: Mr. Brian Imel, Director of Marketing

Either party may change their address for service by notice to the other party.

12.2 **Further Assurances**

Either party agrees that from time to time it shall take such further steps, do such acts and execute and deliver such documents as may be contemplated herein or reasonably required by either party to more fully carry out the intent of this agreement.

12.3 **Time**

Time shall be of the essence for all dates set forth herein and also for any extension(s), mutually agreed to or otherwise, of any date.

12.4 **No Partnership**

It is not the intention of the parties to create a partnership, agency or other similar relationship hereby and the liabilities of the parties shall be separate and not joint or collective.

12.5 **Choice of Law**

This Agreement shall be construed in accordance with the laws in force in the Commonwealth of Massachusetts. Each of the parties hereby abides to the courts of the Commonwealth of Massachusetts.

11

12.6 **Waiver**

No waiver by or on behalf of either party of any breach of any term, covenant, restriction or stipulation shall take effect or be binding upon the party unless the same is expressed in writing and signed by the party to be bound. Any waiver so given shall extend to the particular breach so waived will not limit or effect the rights of the parties with respect to any other or future breach.

12.7 **Assignment**

Licensee shall not assign this Agreement without the prior written consent of Licensor. Licensor shall be entitled to assign all or any part of this Agreement including without limitation, Royalties.

12.8 **Entire Agreement**

The terms of this Agreement express and constitute the entire Agreement between the parties as of the Effective Date hereof and supersede and replace any and all conversations and negotiations between the parties.

## EXECUTION

WHEREFORE, the parties hereto have caused this Agreement to be executed in duplicate originals by their duly-authorized representatives as of the date set forth below.

| **AMES TRUE TEMPER, INC.** | **HARRY S. BILLADO, JR.** |
|---|---|
| Per: _Brian J. Imel_ (Signature) | Per: _HARRY S. BILLADO, JR._ (Printed or Typed Name) |
| _BRIAN T. IMEL_ (Printed or Typed Name) | Harry S. Billado, Jr. (Printed or Typed Name) |
| Title: DIRECTOR OF MARKETING | _Harry S. Billado, Jr._ (signature) |
| Date: DECEMBER 2, 2004 | Date: November 26, 2004 |

**AMES** *Lawn & Garden Tools - Since 1774*   LICENSE AGREEMENT